Richard A. SCHUENEMAN, Appellant (Respondent Below),

v.

Carol A. SCHUENEMAN, Appellee (Petitioner Below).

No. 20A04–9102–CV–42.

Court of Appeals of Indiana, Fourth District.

May 14, 1992.

Richard L. Mehl, Mehl, Mehl & Beeson, Goshen, for appellant.

William J. Cohen, Rebecca F. Butler, Elkhart, for appellee.

MILLER, Judge.

Richard Schueneman appeals the trial court's disposition of marital property between him and his former wife of twenty-four years, Carol Schueneman. Richard argues the trial court abused its discretion in the way in which it divided the marital property and in the value it assigned to certain assets. We affirm the court's decision in part and reverse and remand for the following reasons: 1) the trial court erred in failing to dispose of all of the marital property; and 2) the court erred in failing to enter reasons why awarding Carol the entire interest in her pension plan was just and reasonable.

### FACTS

Richard and Carol Schueneman divorced after twenty-four years of marriage. Five children were born to the couple: Mary, now age 26; Richard, 25; Therese, 23; Joann, 21; Janice, 19. Carol filed for divorce on September 23, 1988. On October 17, 1988, Richard and Carol entered into an agreement which was adopted by the trial court as a provisional order, and which provided, among other things, that Richard was to pay

> "all truck expenses, his long distance phone charges, his medical and dental expenses, Visa and Mastercard bills, his car payment, all expenses of court-ordered counselling, income proportionate share of children's medical, dental, orthodontia, prescription expenses and insurance premiums on insurance in his name."

Appellant's Brief, 42-3. On August 31, 1989, the court dissolved the marriage. After a hearing, the court entered a final dissolution of marriage decree and an order distributing the parties' assets on October 3, 1990.

The trial court determined the parties' marital property, including a mobile home, cars, various small bank accounts, and personal property, was worth $31,752, and liabilities were $31,413. In addition, the parties held a substantial escrow account which was funded with the proceeds from a lawsuit (Day lawsuit). While the divorce was pending, both parties were each advanced $10,000 from the account. After mutual obligations were paid from the account and after the court set aside $15,000 for the children's education, about $27,000 was left in the account. The court divided these assets evenly. However, Carol, then 52, was awarded her vested interest in a pension plan at the Elkhart General Hospital and Richard was awarded all interest in RA Schueneman, Inc. Finally, both parties were ordered to pay for half of the medical and insurance expenses for their children while the children are in college.

### DISCUSSION

Our standard of review is well settled. We may not reweigh the evidence or assess the credibility of witnesses. *In re Marriage of Davidson* (1989), Ind.App., 540 N.E.2d 641. We consider only the evidence

most favorable to the trial court's disposition of the property. *Id.* The division of property is left to the discretion of the trial court and this determination will not be reversed on appeal unless the trial court abused its discretion. *Clark v. Clark* (1991), Ind.App., 578 N.E.2d 747. A trial court abuses its discretion when its decision is clearly against the logic and effect of the facts and circumstance before it. *Id.; Dahnke v. Dahnke* (1989), Ind.App., 535 N.E.2d 172.

### I. Assets and Liabilities

■ Richard argues the trial court abused its discretion 1) by not allowing him credits for liabilities he paid and 2) in the way in which it valued certain assets. First, he argues that a debt to First State Bank of Middlebury which the court ordered him to pay was $3,309.54 instead of the $2,287.00 the court found it to be. Therefore, Richard argues, he should be credited an additional $1,022.54. Richard testified he got a loan from First State Bank for $3,309.54; however, there is evidence—a letter from the bank—that the balance on the loan is $2,217.93. (R. 161). The trial court did not err in finding the debt to be $2,217.93.

■ Richard further contends he should be given credit for paying the following debts: 1) Dr. Thomas—$437.60; 2) GTE—$292.53; 3) Mastercard and Visa Accounts—$666.35 each; and 4) Sam's Tire—$300.00 ($2,363.13 total). Carol argues Richard agreed to pay these expenses by the court's provisional order dated October 17, 1988; therefore, the trial court did not err by not giving Richard credit for these payments.

We agree with Carol. According to the court's provisional order, Richard agreed to pay his long distance phone bills, doctor bills, truck expenses and the Mastercard and Visa bills. Further, Carol presented evidence that Dr. Thomas's bill and the Visa and Mastercard bills were Richard's obligations. Carol's exhibit 1—which was placed in evidence without objection—lists the parties' assets and liabilities and compares the values assigned to them by Carol to the values assigned by Richard. The exhibit also contains a column for "up to date information". Next to Dr. Thomas's name the notation "Hus. paid $410.00 his bill" appears. The notation "Hus. Obliga." appears next to the listings for both the Mastercard and Visa bills. Further, Richard testified he and Carol had agreed he would pay the telephone bill, and Carol would pay the rest of the utilities. Finally, it is undisputed that the bill from Sam's Tire was a corporate liability; therefore, the court could have determined it was a truck expense, which Richard agreed to pay. This evidence was before the court and considered by it in making its final disposition of the parties' property. We must decline Richard's invitation to reweigh the evidence.

■ Richard also argues the trial court abused its discretion in the value it assigned certain assets. Although the parties stipulated to the value of many of their assets, the evidence of the value of the remaining assets was conflicting. In each case, however, the value assigned by the trial court was supported by the evidence.[1] Therefore, we find no abuse of discretion.

---

1. Richard attacks the value the trial court placed on the following assets: (Coincidentally, these are not the only assets whose value Richard and Carol contested—these are the assets which were not given the value Richard argued they should have been given):

*1. Mobile home and miscellaneous household items and appliances* (awarded to Carol)—Carol presented an appraisal of $4,900 (R. 151) and argued the appliances and furnishings were worth $3,750 ($8,650 total). Richard argued the retail value of the home (not including appliances and furnishings) was $16,835, and that the appliances and furnishings were worth $3,900. The court, noting the substantial difference in the evidence, determined the home, including miscellaneous appliances and furnishings was worth $9,000.

*2. Dining room set*—Carol's grandmother gave Carol an antique table and chairs as a gift, which Richard repaired and refinished. Carol testified the chair seats were nothing more than pieces of wood tacked to the frames and the original pedestal had been replaced, making its value negligible. Richard argues it is worth at least $1000. Trial court gave the set to Carol, but found it to be worth nothing.

Finally, Richard argues the trial court erred by not providing for the disposition of a camera, photographs which Carol had agreed to give to Richard, three antique crocks Richard's mother had given him, and his brother's engine stand.

It is the trial court's duty to divide all the property of the parties. Ind.Code 31–1–11.5–11; *Nill v. Nill* (1992), Ind.App., 584 N.E.2d 602; *Riddle v. Riddle* (1991), Ind. App., 566 N.E.2d 78. Contrary to Richard's argument, the trial court's order did state Richard was to receive "fishing and camera equipment"; therefore, the camera was included in the final order. Carol agreed she would give Richard one-half of the photographs of their children. If Carol has not given Richard the photos, as Richard asserts in his brief, on remand, he should request the court to enter an order requiring Carol to do so. Further, it is undisputed that Carol had the three crocks Richard requested the court award to him. On remand, the court should order disposition of these crocks. Finally, the engine stand belonged to Richard's brother, not to Richard or Carol. The trial court's duty is to dispose of the *marital* property. The engine stand was not marital property and the court did not err in not mentioning it in the final order.

## II—Carol's Pension Plan

Richard argues the court erred by awarding Carol the entire interest in her pension plan with Elkhart General Hospital, where she had worked about twenty-nine years, in which she was 100% vested, without a corresponding credit to him or without entering a qualified domestic relations order (QDRO) to balance the property distribution. Carol does not dispute that she was 100% vested in the plan as of September 23, 1988 (the day on which she filed the petition); rather, she argues that the pension plan is not a marital asset because she does not have a present right to receive any money from it. She cites *In re Marriage of Delgado* (1982), Ind.App., 429 N.E.2d 1124, in support of this argument.

Carol's reliance on *Delgado* is misplaced. There, this court was faced with the question of whether the trial court erred in determining that Husband's interest in a pension plan was vested. There, we followed the rule stated by this court in *Wilson v. Wilson* (1980), Ind.App., 409 N.E.2d 1169, 1178:

"[W]here the pension is not present or vested in that the retiree must survive in order to receive the next periodic payment and is not entitled to receive payment on demand, the pension is not marital property which can be divided or awarded to the other spouse under IC 31–1–11.5–11".

In 1985—after both *Wilson* and *Delgado* were decided—the legislature amended Ind. Code 31–1–11.5–2 to include the following definition of property:

"(d) The term 'property' means all the assets of either

party or both parties, including:

(1) a present right to withdraw pension or retirement benefits;

(2) the rights to receive pension or retirement benefits *that are not forfeited upon termination of employment, or that are vested, as that term is defined in Section 411 of the Internal*

---

3. *Handguns and rifles*—Richard argues these should be valued at $750.00. Carol listed a value of $2,000 on her financial disclosure; however, she testified at the hearing without objection that she and Richard had agreed they should be valued at $1,000. Court assigned value of $1,000 and awarded them to Richard.

4. *Tools*—Richard was awarded the tools which he testified had been appraised at $405; however, he admitted the person who did the appraisal did not see all of the tools. Carol argued the tools were worth $2,000, which she testified (without objection) was the value placed on them by Richard on a financial disclosure made by him (she does not say when or why) to the bank. The court valued them at $1,000.

5. *Warranty Credits*—Carol testified that Richard had received some defective parts made by Borg Warner, and when he took them back, he received warranty credits instead of cash refunds. Carol argued they were worth at least $1,000 and testified that Richard told her he had a bill for $1,800.00 for parts which he believed would be covered by the credits. Richard testified there were no warranty credits. The court assigned a value of $1,000 and awarded them to Richard.

*Revenue Code, but that are payable after the dissolution of marriage;* and

(3) the right to receive disposable retired or retainer pay, as defined in 10 U.S.C. 1408(a) acquired during the marriage, that is or may be payable after the dissolution of marriage." (emphasis supplied).

After this amendment, our courts have held that vested retirement pensions which are not forfeited upon termination and are contingent upon the retiree's survival are part of the marital pot. *Kirkman v. Kirkman* (1990), Ind., 555 N.E.2d 1293; *In re Marriage of Adams* (1989), Ind., 535 N.E.2d 124; *Staller v. Staller* (1991), Ind. App., 570 N.E.2d 1328; *Skirvin v. Skirvin* (1990), Ind.App., 560 N.E.2d 1263. Thus, contrary to Carol's argument, her pension plan is part of the marital pot.

▋ The court was not, however, required to split the pension 50/50 between Richard and Carol. Rather, I.C. 31–1–11.5–11 requires the court to divide *all* the marital property "in a just and reasonable manner." This statute creates a rebuttable presumption that an equal division of the property is just and reasonable; however, the presumption "may be rebutted by a party who presents relevant evidence ... that an equal division would not be just and reasonable ...". *Seslar v. Seslar* (1991), Ind.App., 569 N.E.2d 380, 382. If the trial court determines from the evidence that a 50/50 split would not be just and reasonable, it must state its reasons for deviating from the presumptive 50/50 split. *Id.*

The trial court made no finding as to the value of the pension. Carol presented evidence that she was vested in the pension plan as of September 23, 1988;[2] however, she testified she had no idea what the plan was worth. Richard attempted to present evidence on the value of the plan as follows:

"Q. Now, next, on, ah, the wife's pension, did you value that pension at $15,-665.40?

"A. Yes. The was we—can I explain how we did that?

"Q. Explain how we did it.

"A. We did it—your Honor, what we did is we took what it was worth per year time five years.[3] According to x-ray (sic) tables, she's [sic] probably live seventeen years after sixty-five.

"Q. Five years after sixty-five.

"A. Well, we took five years. That's all I did is took—and half of that ...".

(R. 282).

▋ Based on his testimony of the pension's value, Richard argues the distribution of the estate is uneven. We agree that if $15,000 is added to the marital estate, Carol's share would be 68% and Richard's 32%. However, if an interest in the plan is reflected in the immediate exchange of property (as opposed to the award of an interest in payments beginning thirteen years hence) there must be some reasonably accurate evidence of its present value. *See Libunao v. Libunao* (1979), 180 Ind. App. 242, 388 N.E.2d 574. Richard's testimony is confusing at best. He determined the value by determining that thirteen years from now, (Carol is fifty-two), Carol will receive $3,133 year, and multiplying that figure by five. There is no indication that Richard's calculations were intended to arrive at a present value of the plan, and, of course, there was no attempt to

---

2. Carol's exhibit "L" is a letter from the Director of Compensation & Benefits and provides in relevant part as follows:

"Should Carol have terminated her employment on September 23, 1988, she would have had a deferred pension value of $261.09 per month at age 65. Due to the fact that she was 100% vested in the pension plan as of September 23, 1988, there would not have been a cash settlement upon termination of her employment.

"Should Carol terminate her employment on November 9, 1989, she would have a deferred pension value of $346.23 per month at age 65. Due to the fact that she is 100% vested in the pension plan there would not be a cash settlement upon termination of her employment." (R. 162).

3. Richard based this figure on a payment of $261.09 to which Carol would be entitled each month once she reached 65 ($3,133 a year) if she had left her job on September 23, 1988. (R. 162). Richard took the first five years as a "guestimate".

qualify Richard as an expert. Determining the present value of the pension would require actuarial evidence, "based on the probability that the employee spouse will live to the date of vesting and that [s]he will remain in the pension plan until that time." H. Clark, The Law of Domestic Relations in the United States, § 16.6 at 212 (1987). *See also In re Marriage of Hunt* (1979), 78 Ill.App.3d 653, 34 Ill.Dec. 55, 397 N.E.2d 511; 27C C.J.S. *Divorce* § 558 (1986). Richard's guesswork cannot be considered substantive evidence of the present value of the plan. Nevertheless, it is likely that the plan has some value and, by awarding it to Carol, the trial court made an unequal distribution of the marital estate without making findings why a deviation from a 50/50 split was just and reasonable.

Therefore, we must remand this issue to the trial court for further consideration. Neither party suggests a present value other than Richard's guess; therefore, any division by the court based on the plan's present value would be speculative. However, as an alternative, the court may order a percentage of Carol's *future* payments be paid to Richard. I.C. 31–1–11.5–11(b)(4). Again, the court is not required to divide the property 50/50; however, if the court determines the property should not be divided 50/50, it must state it reasons therefor.[4]

### III. Richard's Uninsured Medical Expenses

 Richard argues the court erred in not including as marital debts uninsured medical expenses he personally incurred after the court granted the divorce but before it entered the final order in October, 1990. He argues that he was not informed that he would not be carried on Carol's policy after the divorce was final; therefore, he did not obtain his own medical

insurance. In order to make a just and reasonable property division, he argues, the court should have included these expenses as marital debts.

In general, the marital pot closes upon the filing of the dissolution petition. I.C. 31–1–11.5–11(a) and (b); *Skirvin, supra,* 560 N.E.2d 1263. Richard points out that this rule has been expanded with respect to pension plans. He argues it should also be expanded with respect to liabilities.

In *Adams, supra,* 535 N.E.2d 124, the supreme court held that the pension plan in which husband became vested *after he filed his dissolution petition* was part of the marital pot. Shortly thereafter, in *Kirkman, supra,* 555 N.E.2d 1293, the court determined that the trial court did not err by excluding husband's retirement pension from the marital pot because his "right to pension benefits was neither vested nor had it become 'not forfeited upon termination' *prior to the entry of the dissolution decree." Id.* at 1294. The court's holdings in *Adams* and *Kirkman* led Judge Robertson, writing for the majority in *Skirvin, supra,* to conclude:

> "*Adams* as clarified by *Kirkman,* simply alters the long-established rule that the marital pot closes upon the filing of the dissolution petition. Ind.Code 31–1–11.5–11. Now the pot is closed—*with respect to pension acquired by the joint efforts of both spouses*—on the date the court enters its decree."

*Id.,* at 1265 (emphasis supplied).

Including pensions acquired by the joint efforts of both spouses that vest *after* the petition is filed and *before* the court enters the final decree in the marital pot assures that both parties benefit from their joint efforts. The same reasoning does not, however, apply to liabilities incurred by *one* spouse *after* the parties have been divorced. We therefore decline Richard's invitation to further extend the long-stand-

---

4. Carol argues that the trial court set off the entire amount of the pension to her because she worked in the family cider business without drawing a salary and without a corresponding social security payment; whereas, Richard drew a salary and made payments to social security, which, according to Carol could be considered

his pension. The trial court did not, however, state a reason for its unequal division. Therefore, we cannot say why the court did what it did. We do note that Richard was awarded the entire interest in RA Schueneman, Inc., but there was no evidence the company had any value.

ing rule that the marital pot is closed when the petition is filed.[5]

### IV. College Escrow Fund

▮▮▮▮ Richard argues the court abused its discretion in setting up an escrow fund for the children's education. At the time of the final property distribution, three of the children were in college—Janice, who was expected to graduate in May, 1994; Joann, May, 1993; and Therese, May, 1991. Before dividing the funds from the proceeds of the Day lawsuit, the court set aside $15,000 to be held in trust for Janice's, Joann's and Therese's college educations.

A child support order may include sums for a child's secondary education. I.C. 31–1–11.5–12(b). In addition, "the court may set apart such portion of the property of either parent, or both parents, as may seem necessary and proper for the proper support of the child." I.C. 31–1–11.5–12(c). Richard concedes that, read together, these provisions empower the court to establish a trust fund for the children's education. *See In re Marriage of Davidson, supra,* 540 N.E.2d 641. Nonetheless, he argues the court abused its discretion in setting up the fund here because there was no evidence he and Carol would not continue to pay for the children's education or that $15,000 was needed to pay those expenses.

The trial court considered a number of factors in reaching its conclusion $15,000 should be set aside, as demonstrated by the following relevant part of the court's order:

"The 1989–1990 parental contribution for the children of the parties in college was $3,576.00 ... Richard's testimony also indicated that the parent's portion of the college expenses may increase due to lessened financial aid including grants because of the Day lawsuit proceeds. The Court also notes that the parental contribution will likely increase now that the parties have less than four children enrolled in college. In order to assure

that funds will be available to allow the parties' children to complete their college education, the amount of Fifteen Thousand Dollars ($15,000) shall be retained in a joint escrow account requiring the signatures of both parties for withdrawal, or the judge's signature if the parties are unable to agree, to provide for anticipated college expenses presently averaging Three Thousand Dollars ($3,000) per year, excluding Richard Schueneman who has now graduated. The above figures take into consideration the anticipated graduation dates of the parties' children as follows: Janice Schueneman (May 1994), Joann Schueneman (May, 1993), and Therese Schueneman (May, 1991)

"In the event the account is depleted before all children are emancipated, the parties shall each be responsible for one-half of the children's college education expenses as in paragraph 2(a) above.

"Any funds remaining in the escrow account when the youngest child graduates from college or reaches the age of twenty-four years, will be distributed equally to the parties."

(R. 86–7). The court was not required, as Richard argues, to find that he and Carol were not likely to continue paying the college expenses. The trial court acted within its discretion to establish the escrow account to assure that there would be funds available to pay for the children's education. We find no abuse of that discretion.

### ISSUE V—Children's Medical Expenses, Health/Dental Insurance

Richard argues the court abused its discretion in ordering him, in the interim order, to pay 55% of the medical expenses (including insurance) incurred by his children who are over twenty-one but still in college, and in ordering him to pay 50% of their medical expenses in the final order. In a related argument, he asserts he should

---

**5.** Richard was represented throughout these proceedings by counsel, whose purpose it is to advise his client (Richard) of the legal ramifications of the court's orders. However, with regard to this, counsel stated:

"Now, through—probably through shortsightedness on my part, when this—when the court divorced you, you lost your insurance benefits through your wife's employer. (R. 304–5).

not have to pay for his son's (Richard's) orthodontia work. Carol argues that Richard has waived this argument because he testified at the final hearing that he agreed to pay the children's medical expenses.

*A. Medical Expenses:*

We note initially that the October, 1988, interim order was made pursuant to the parties' agreement, wherein Richard agreed to pay his "income proportionate share [55%] of children's medical, dental, orthodontia, [and] prescription expenses." Further, at the October 30, 1989, hearing on Carol's petition for unpaid child support, Richard's attorney stated on Richard's behalf:

"On the medical expenses, they listed, ah, quite a few, he's willing to pay the insurance and the medical, dental insurance coverage on the four children from October of '88 through August of '89 and that's $1,090.00. He'll pay—he agrees to pay that. That would be exclusive of the oldest one, Mary Catherine."

(R. 111). At the final hearing, Richard testified as follows:

A. "I have told my children, and I'll put it here on record, if my wife—my former wife, whatever she wishes to do, I have asked and I have pleaded for those children to send me their bills and I would pay them, and I don't care what they are. Send me the bills and I'll pay 'em. I don't want to have anything to do with my former wife after this hearing is over. It is to my way of thinking an easy way to settle it. Kindly put it in the record, have them send me their bills and I'll pay the damn things."
Q. But what about medical insurance?
A. She can pay the medical insurance.
Q. And you'll pay all uninsured medicals?
A. *I'll pay all uninsured medical bills until they're out of college.* I have no problem with that. They're my children.

(R. 338–39, emphasis supplied).

Clearly, Richard agreed to pay the children's past and future uninsured medical expenses (but not the medical and dental insurance, *see* "B" *infra*), and the court's

order reflected Richard's agreement. Therefore, error, if any, was invited by Richard and he must now abide by the court's order. *City of Hammond, Lake County v. N.I.D. Corporation* (1982), Ind. App., 435 N.E.2d 42 ("A party must abide by the procedure it has induced the court to follow, and to which it has given its consent." *Id.* at 46, citations omitted).

We also note that the parties to a divorce are free to agree to the custody and support of their children, I.C. 31–1–11.5–10(a), even though the trial court may not have the authority to order the parties to do as they agree. *See, e.g., Steele v. Davisson, Davisson & Davisson* (1982), Ind.App., 437 N.E.2d 491 (Parties may agree to a property settlement agreement whereby payments are terminated upon the remarriage of the spouse even though such a provision in the trial court's order would be unenforceable as against public policy); *Hicks v. Fielman* (1981), Ind.App., 421 N.E.2d 716 (The court may order maintenance only after finding one of the parties is incapacitated; however, the parties are free to agree to maintenance even if there is no finding one party is incapacitated). Thus, even though the trial court may not have had the authority to order Richard to pay the uninsured medical expenses of his children over 21, Richard agreed to pay them and is bound by that agreement.

Richard also argues he should not have to pay for his son's braces because his son was about to enter the army. However, it is undisputed that Richard (Jr.) was still in college when he had the orthodontia work done. Therefore, Richard was required to pay for his share as he agreed to do.

*B. Health and Dental Insurance:*

Richard makes a similar argument with respect to the children's health and dental insurance. He was ordered to pay 55% of the insurance in the interim order and 50% of the insurance in the final order. He argues that these payments are support; therefore, his obligation to pay ended when the children reached 21.

Indiana Code 31–1–11.5–12 provides in part:

"(d) The duty to support a child under this chapter ceases when the child reaches twenty-one (21) years of age unless:

(1) the child is emancipated prior to reaching twenty-one (21) years of age in which case the child support, except for the educational needs outlined in subsection (b)(1) terminates at the time of emancipation; however, an order for educational needs may continue in effect until further order of the court . . .".

Richard argues he should be reimbursed from Carol for the insurance for which he has already paid. However, Richard did not present this argument to the trial court at the final hearing, nor did he present evidence of what portion of the insurance went for children over 21. Thus, we find that this argument has been waived. *See Franklin Bank and Trust Co. v. Mithoefer* (1990), Ind., 563 N.E.2d 551.

Richard further argues the trial court was without authority to order him, in the final order, to pay for 50% of the insurance for the children over 21 until they graduate from college. Indiana Code 31–1–11.5–12(d), quoted above, clearly states that child support obligations cease when the child reaches twenty-one. *Ross v. Ross* (1979), Ind.App., 397 N.E.2d 1066. However, a parent may still be required to pay the educational needs as outlined in subsection 31–1–11.5–12(b)(1); *Martin v. Martin* (1986), Ind., 495 N.E.2d 523.

Indiana Code 31–1–11.5–12(b)(1) provides as follows:

"(b) The child support order may also include, where appropriate:

(1) sums for the child's education in elementary and secondary schools and at institutions of higher learning."

Ind.Code 31–1–11.5–12.1 provides in part:

"In addition to the matters described in section 12 of this chapter, a child support order may also include, where appropriate, basic health and hospitalization insurance coverage for the child. . . ."

Thus, an order to pay college expenses is a "support order" and the court has specific statutory authority to include—where appropriate—insurance coverage in its order. Here, there was evidence of the children's health care needs and of the parents' ability to meet these needs. It was within the trial court's discretion to determine if it was appropriate, given this evidence, to include health insurance coverage in the order. We find no abuse of that discretion.

The decision of the trial court is affirmed in part, and reversed and remanded in part.

STATON, J., concurs.

CHEZEM, J., concurs in result.