**John M. HARTLEY, Appellant–
Respondent,**

v.

**Nancy F. HARTLEY, Appellee–
Petitioner.**

**No. 48A04–0603–CV–147.**

Court of Appeals of Indiana.

March 5, 2007.

Jason A. Childers, Hulse Lacey Harda-cre Austin & Shine, P.C., Anderson, IN, Attorney for Appellant.

D. Eric Hall, Busby Austin Cooper & Farr, Anderson, IN, Attorney for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

John M. Hartley ("John") challenges the trial court's dissolution decree that ended his marriage to Nancy F. Hartley ("Nancy"). We affirm.

### Issues

John raises three issues, which we restate as follows:

I. Whether the trial court erred in its disposition of marital property;

II. Whether the trial court erred in failing to apply a parenting time credit to his child support obligation; and

III. Whether the trial court erred in denying his request for attorney fees.

### Facts and Procedural History

On May 27, 1988, John and Nancy were married. They had three children during their marriage: J.M.H., born September 29, 1988; J.A.H., born April 16, 1990; and S.H., born April 6, 1993.

On July 21, 2004, John filed a petition for dissolution. On November 23, 2005, and December 21, 2005, the trial court held a hearing on the petition. The trial court took the matter under advisement and requested that the parties file proposed findings of fact and conclusions thereon, and both parties did so. On February 16, 2006, the trial court issued its final judgment, which included the following relevant findings and conclusions:

### FINDINGS OF FACT

. . . .

9. John Hartley is employed by Sears and in 2004 had earnings of $32,232.00 and testified his earning[s] were slightly higher in 2005. John Hartley also purchases cars and repairs the same for resale and sells about four vehicles per year averaging $350.00 profit per sale.

10. Nancy Hartley is employed at Roche Diagnostics at an annual salary of $66,482.00 in 2004. Her earnings were comparable in 2005.

. . . .

16. . . . . In 2005, John Hartley had only 68 overnights with only one child rather than three children. As a result of having overnight visitation with only one child at a time, John Hartley would need 153 overnights with a child before he would be eligible for a parenting time credit pursuant to the Indiana Parenting Time Guidelines.

. . . .

19. Jo Anne Main, Nancy Hartley's mother, made gifts to Nancy Hartley and her family. The gifts started in 1990 after Jo Anne's husband, John Farr, died. The gifts came from a trust fund established by John Farr and other monies came from Jo Anne Main's savings. From 1990 to 2003, Jo Anne Main gave Nancy and her family

$158,000.00 . . . . Ms. Main's gifts were intended for Nancy to use for the children even though some of the gifts were distributed to John Hartley or the children.

. . . .

23. Jo Anne Main and Nancy Hartley purchased gold with a portion of the money prior to the Y2K scare. The three payments made in 2001 for $3,000.00 each to [J.M.H, J.A.H., and S.A.] were made directly to 529 Putnam college accounts. Nancy Hartley was also aware that the monies paid to Nancy and the three children in 1999 in the sum of $40,000.00 were to be applied to the purchase of acreage in Markleville as an investment for the children's college education.

24. The parties own a house [in] Pendleton, Indiana which was appraised for $158,000. The house has no mortgage.

25. The home [in] Pendleton, Indiana was originally purchased for $56,000.00 in 1988. $40,000.00 in lump sum payments on the mortgage were made by Nancy Hartley from the gifts received from Jo Anne Main.

26. The parties also own 11 acres [in] Markleville, Indiana. . . . The property also has a mobile home on site. The land and the mobile home were appraised for $72,000.00. The Markleville acreage was purchased in 1999 for $56,000.00. $40,000.00 of the purchase price came from gifts from Jo Anne Main and $16,000.00 was borrowed from Nancy Hartley's 401(k) account through Roche Diagnostic[s].

27. The parties own $50,032.00 in United States Savings Bonds. Most are titled in either John Hartley's name or Nancy Hartley's name. The gifts from Jo Anne Main were used to purchase 80% of the bonds. About $10,000 worth of bonds were purchased through a program at John Hartley's employment. The parties agree that these monies should be used for the children's post-secondary educations.

28. Nancy Hartley and Jo Anne Main purchased gold and silver prior to the Y2K scare with monies given by Jo Anne Main and from custodial accounts for J.M.H. and J.A.H. The gold and silver have a value of $17,771. . . . .

29. In December, 2003, Jo Anne Main gave $9,000 directly to 529 Putnam college accounts for [J.M.H., J.A.H., and S.H.]. These accounts have a combined value of $9,074.00.

30. In December, 2000, Jo Ann Main gave Nancy Hartley $10,000 which was immediately invested into a custodial account for J.M.H. The account at the time of separation had a value of $7,402.00 and Nancy Hartley is the custodian of this account.

31. John Hartley has a defined benefit pension and 401(K) account through his employment with Sears. All of John's employment at Sears occurred during the marriage. John Sandlin, CPA, valued Mr. Hartley's retirement benefits as having a pre-tax value of $64,985.00 and an after-tax value of $52,313.00.

32. Nancy Hartley has a defined benefit pension and a 401(K) account through her employment with Roche Diagnostics. A small portion of her retirement benefits [was] earned prior to the marriage. John Sandlin, CPA, valued Mr. Hartley's retirement benefits as having a pre-tax value of $161,481. With a coverture ratio of 92.02 percent, the retirement benefits earned during the marriage had a pre-tax value of $148,595 and an after-tax value of $119,619.

33. The household furnishings and tools were divided by agreement of the parties and not specifically valued.

34. The parties own five vehicles: a 1996 Buick Roadmaster driven by John Hartley valued at $6,590.00; another 1996 Buick Roadmaster driven by Nancy Hartley valued at $4,500.00 because of higher mileage and needed repairs; a 1973 Chevrolet Caprice convertible valued at $10,000.00; a 1978 Chevrolet Silverado truck valued at $2,000.00, and a 1983 Chevrolet Silverado truck valued at $800.00.

35. During the course of the marriage, Nancy Hartley was the principal wage earner and also managed a large share of the parenting and household responsibilities. For most of their married life, John Hartley worked about 25 hours a week.

36. The three Hartley children are within five years of each other. All of them may be attending college or vocational training at the same time.

. . . .

40. The parties desire for their children to attend college if they so choose. Most of the investments made by the Hartleys were to insure their children's higher educations. The gifts made by Jo Anne Main were intended for the Hartley children's future.

41. The parties intended to use their investments to pay for their children's post-secondary education.

42. Nancy Hartley has requested that the investments made for their children's education be placed in a trust, controlled by the parties, for college and vocational expenses with the remainder to be divided between the parties when the youngest child is past college age. The education trust would represent a continuation of the parties' intent to maintain funds for their children's education.

. . . .

### CONCLUSIONS OF LAW

. . . .

2. The parties shall have joint legal custody of the children with Nancy having primary physical custody.

. . . .

4. John Hartley shall pay child support in the sum of $167.00 commencing next Friday based on the changes in the parties['] income and his limited overnight contact with the children.

. . . .

10. The Court, being duly advised in the premises and led by the facts in this case, must conclude that unique circumstances exist that preclude equal distribution and partitioning of assets and liabilities as contemplated by the statute as follows:

 a. $158,000.00 was given to Nancy Hartley and her family by her mother as gifts between 1990 to 2003 as an advance of Nancy's inheritance.

 b. Nancy Hartley's significant contributions to the acquisition of property during the course of the marriage, based on her being the principal wage earner and undertaking a prominent role in child care and household tasks.

11. The Court acknowledges that it is making an uneven distribution of marital property and also considers the fact that the parties also intended for funds to be available for the children's higher education.

12. The Court concludes the value of the assets of the marriage are as follows:

Real Estate [in] Pendleton, Indiana $ 58,000.00 [1]

---

1. The record establishes, and the total value of the marriage assets reflects, that the real estate has an actual value of $158,000.00. Appellee's App. at 6.

| | |
|---|---|
| Nancy Hartley's pension and 401(k) from Roche Diagnostic[s] $148,595.00 pre tax value and $119,619.00 after tax value. | $ 119,619.00 |
| John Hartley's Sears Pension and 401(k) pre tax value $64,985.00 and after tax value $52,313.00 | 52,313.00 |
| Household goods and tools | ( not valued) |
| Markleville [Property] | $ 72,000.00 |
| United States Savings Bonds—Series EE | $ 50,031.75 |
| Gold and Silver | $ 17,771.00 |
| 529 Plan Putnam Funds | |
| [J.M.H.] | $ 3,008.65 |
| [J.A.H.] | 3,015.69 |
| [S.H.] | 3,045.45 |
| John's 1996 Buick Roadmaster | $ 6,590.00 |
| Nancy's 1996 Buick Roadmaster | $ 4,500.00 |
| 1973 Chevrolet Caprice Convertible | $ 10,000.00 |
| 1978 Chevrolet Silverado | $ 2,000.00 |
| 1983 Chevrolet Silverado | $ 800.00 |
| **TOTAL** | $ 502,694.54 |

13. Based on the following considerations and relevant facts and conclusions, the Court finds the following distribution to be reasonable, just and logical.

14. The following assets are set over to John Hartley:

| | |
|---|---|
| a. John Hartley's Sears pension and 401(k) benefit. (after tax value) | $ 52,313.00 |
| b. All household goods and tools in his possession. | |
| c. The 1996 Buick Roadmaster he is driving. | 6,950.00 [2] |
| d. The 1973 Chevrolet Caprice convertible, 1978 Chevrolet Silverado, and the 1983 Chevrolet Silverado. | 12,800.00 |
| e. Markleville [Property] | $ 72,000.00 |
| **TOTAL** | $ 144,063.00 |

15. The following assets are set over to Nancy Hartley:

| | |
|---|---|
| a. The real estate [in] Pendleton, Indiana. | $ 158,000.00 |
| b. Nancy Hartley's pension and 401(k) from Roche Diagnostic[s]. | 119,619.00 |
| c. The 1996 Buick Roadmaster driven by Nancy. | 4,500.00 |
| d. All household goods in her possession. | Not Valued |
| e. Less educational trust. | ($ 69,826.00) |
| **TOTAL** | $ 212,293.00 |

16. John Hartley shall receive the acreage [ ] in Markleville, Indiana as his separate property with the understanding that Nancy Hartley will commit $69,826.00 from her 401(k) and/or a second mortgage on the marital residence towards the children's educational trust. . . . .

17. The division of property provides Nancy Hartley with 60 percent and John Hartley with 40 percent of the marital assets remaining after the trust is funded.

18. Indiana Code 31–16–6–3 permits the Court to set apart the property of either or both parents for necessary and proper support of their children.

19. Unless property is set aside, funds are not likely to be available for the children's post-secondary educations giv-

2. The value of the 1996 Buick Roadmaster in conclusion 12 of the trial court's order is $6,590.00. Appellant's App. at 16–17. We address this discrepancy below.

en their close ages and the short period of time before they become college age.

20. The parties have received substantial funds from Jo Anne Main as gifts intended to benefit the children's future and the parties have set aside funds with the primary intention of using said funds for higher educational expenses.

21. The Court concludes that an educational trust should be established for the children as a continuation of their intent to invest for their children's education.

22. The following assets shall be included in the trust to be held for the children's education:

a. $69,926.00 to be contributed by Nancy Hartley as described above.[3]

b. United States Savings Bonds held by John and Nancy Hartley valued at $50,031.75.

c. The gold and silver held by Nancy Hartley $17,791.00.[4]

d. The 529 plan funds for [J.M.H., J.A.H., and S.H.], totaling $9,072.69.

23. ....

d. On termination of the educational trust, the funds remaining in the trust will be distributed 60 percent to Nancy Hartley and 40 percent to John Hartley if both survive.

....

25. Each party shall be responsible for his or her own attorney fees.

Appellant's App. at 9–19.

### Discussion and Decision

In the present case, the trial court requested proposed findings of fact and conclusions thereon on its own motion.

Sua sponte findings control only as to the issues they cover. When a trial court has made findings of fact, we review the sufficiency of the evidence using a two-step process. First, we must determine whether the evidence supports the trial court's findings of fact. Second, we must determine whether those findings of fact support the trial court's conclusions of law. We will set aside the findings only if they are clearly erroneous. Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts.

In applying this standard, we neither reweigh the evidence nor judge the credibility of the witnesses. Rather, we consider the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. To make a determination that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made. On the other hand, a general judgment will control as to the issues upon which there are no findings. A

---

3. We note that the value of Nancy's contribution set forth in conclusions 15 and 16 of the trial court's order is $69,826.00. Appellant's App. at 18. Because the amount that Nancy was to contribute to the children's trust was chosen by the trial court, there is nothing in the record to establish which value is correct. However, since $69,826.00 appears twice, we think it is more likely the correct value, and

we will therefore rely on it for purposes of our analysis.

4. The value of the gold and silver set forth in conclusion 12 of the trial court's order is $17,771.00. Appellant's App. at 16–17. The evidence establishes that this is the correct value. Appellee's App. at 13. We therefore rely on it in our analysis.

general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence.

*Gregg v. Cooper,* 812 N.E.2d 210, 215 (Ind. Ct.App.2004) (citations and quotation marks omitted), *trans. denied.*

## I. Disposition of Marital Estate

John appeals the trial court's disposition of the marital estate, claiming that certain assets were improperly excluded, that several marital assets were improperly valued, and that Nancy was improperly awarded more than half the estate. We address each in turn.

### A. Excluded Assets

 John first contends that the trial court erred in failing to include in the marital estate the assets it set aside to be placed in the children's education trust fund. In determining the value of the marital estate, the trial court is required to include property owned by either spouse before the marriage, acquired by either spouse in his or her own right after the marriage and before final separation of the parties, or acquired by their joint efforts. Ind.Code § 31–15–7–4. This "one-pot" theory insures that all assets are subject to the trial court's power to divide and award. *Thompson v. Thompson,* 811 N.E.2d 888, 914 (Ind.Ct.App.2004), *trans. denied* (2005). While the trial court may ultimately determine that a particular asset should be awarded solely to one spouse, it must first include the asset in its consideration as to how the marital estate should be divided. *Id.*

The children's education trust fund created by the trial court has a total value of $146,801.44 and includes the $69,826.00 contributed by Nancy, the United States

savings bonds, the gold and silver, and the 529 plans.[5] The trial court included all these assets in its calculation of the value of the marital estate. Appellant's App. at 17. John's real complaint is not that the trial court failed to include the trust fund assets in the marital estate, but that the trial court divided the marital property between the parties *after* the assets in the children's education trust fund were set aside. However, *In re the Marriage of Nickels,* 834 N.E.2d 1091 (Ind.Ct.App. 2005), demonstrates that the trial court did not err in dividing the marital estate in this manner. In *Nickels,* we determined that the trial court did not err in deducting $20,000 for a college education fund from the marital estate before dividing the balance of the estate equally between the parties. *Id.* at 1099.

 John also asserts that the trial court improperly relied on Indiana Code Section 31–16–6–3 to create the children's trust fund. Indiana Code Section 31–16–6–3 provides, "As part of the child support order the court may set apart the part of the property of either parent or both parents that appears necessary and proper for the support of the child." John's argument implies that the authorization provided by Indiana Code Section 31–16–6–3 is limited to circumstances in which a child support order specifically includes support for education and a trust is necessary to insure that the parent pays the education support. We disagree.

In *Schueneman v. Schueneman,* 591 N.E.2d 603 (Ind.Ct.App.1992), part of the marital estate included an escrow account in the names of Richard and Carol Schueneman funded from the proceeds of a lawsuit. Before dividing the assets in the account between the parties, the trial

---

**5.** John states that because the 529 plans are in the children's names only, they may be

properly excluded from the marital estate. Appellant's Br. at 9.

court set aside $15,000 to be placed in a trust for the children's secondary education and ordered that any funds remaining after the last child graduated from college or reached the age of twenty-four be equally distributed between the parties. There was no dispute that Indiana Code Section 31–1–11.5–12(c), the precursor to Indiana Code Section 31–16–6–3, empowered the court to establish the trust fund. Richard challenged the trial court's creation of the education trust fund, arguing that there was no evidence that he and Carol would not pay for the children's education. We held that the trial court was not required to find that he and Carol were not likely to continue paying the college expenses. *Id.* at 610; *see also In re the Marriage of Davidson,* 540 N.E.2d 641, 646 (Ind.Ct.App.1989) (finding no error where trial court set aside bank account and annuity, to be held in both husband's and wife's names, for education of parties' nine-year-old daughter).

Nevertheless, John maintains that the creation of the education trust was inappropriate based on the factors set forth in Indiana Code Section 31–16–6–2, which include the child's aptitude and ability, the child's reasonable ability to contribute to educational expenses through work, loans, and other financial resources, and the ability of the parents to meet these expenses.[6] We disagree.

At the time of the dissolution, J.M.H. was a junior in high school, J.A.H. was in eighth grade, and S.H. was in seventh grade. J.A.H. and S.H. were straight-A students, and J.M.H. thought he might pursue college. In addition, the trial court found that most of John and Nancy's investments were made specifically for their children's post-secondary education. The trial court concluded that if funds were not set aside, money would not be available for the children's post-secondary education because the children were close in age and would soon be of college age. Appellant's App. at 19. The trial court also concluded that Nancy's mother gave the parties substantial funds with the primary intention of using these funds for the children's post-secondary education. Under these circumstances, we find no error in the trial court's creation of the children's education trust or the manner in which it funded the trust.

### B. Valuation of Assets

■ John argues that the trial court erred in valuing the parties' pensions and 401(k) accounts at their after-tax values, in applying a coverture ratio of 92.02% to Nancy's 401(k), and in listing the value of his 1996 Buick Roadmaster.

In a dissolution action, the trial court has broad discretion in determining the value of property, and its valuation will only be disturbed for an abuse of that discretion. So long as there is sufficient evidence and reasonable inferences to support the valuation, an abuse of discretion does not occur. We will not weigh the evidence and will only consider the evidence in the light most favorable to the judgment.

*Breeden v. Breeden,* 678 N.E.2d 423, 425 (Ind.Ct.App.1997) (citations omitted).

■ We first address the trial court's application of after-tax values to the parties' pensions and 401(k) accounts. Tax consequences are governed by Indiana Code Section 31–15–7–7, which provides, "The court, in determining what is just and reasonable in dividing property under this

---

6. Indiana Code Section 31–16–6–2 authorizes the trial court to include money for children's education in elementary and secondary schools and in institutions of higher learning when issuing child support and education support orders.

chapter, shall consider the tax consequences of the property disposition with respect to the present and future economic circumstances of each party." "[T]he statute requires the trial court to consider only the direct or inherent and necessarily incurred tax consequences 'of the property disposition.'" *Harlan v. Harlan,* 560 N.E.2d 1246, 1246 (Ind.1990) (affirming and quoting *Harlan v. Harlan,* 544 N.E.2d 553, 555 (Ind.Ct.App.1989)).

Here, a certified public accountant calculated the pre-tax and after-tax values of the parties' pensions and 401(k) accounts. Appellant's App. at 64, 68; Ex. EEE. The accountant's calculations were admitted into evidence. Tr. at 153–57. John initially objected, stating, "If there's some speculation in that exhibit about after tax value we do object to that part of it." *Id.* at 154. After reviewing the exhibits however, he withdrew his objection, stating,

> Judge, as I see the calculation again today, I think that you're, first of all, right, Your Honor, about the fact that you have to take into account what the possible tax effects might be under Indiana Case Law. And, secondly, I have

no reason to dispute the mathematics used in calculating this so we withdraw any objection that we might have made previously.

*Id.* at 156–57. Having withdrawn his objection, John is now estopped from arguing that the trial court erred in applying the after-tax values to the parties' pensions and 401(k) plans.[7] *See Clark v. Crowe,* 778 N.E.2d 835, 841 (Ind.Ct.App.2002) (holding that party who entered into settlement agreement based on property survey to which he did not object was estopped from arguing that survey was incorrect).

 We now turn to John's contention that the trial court's application of a 92.02% coverture ratio to Nancy's 401(k) was error.[8] John's argument consists of one paragraph, and he fails to cite any supporting authority. A party generally waives any issue for which it fails to develop a cognizable argument or support with adequate citation to authority and portions of the record. Ind. Appellate Rule 46(A)(8)(a); *Olcott Int'l & Co. v. Micro Data Base Syst., Inc.,* 793 N.E.2d 1063, 1068, n. 1 (Ind.Ct.App.2003), *trans. denied.* This argument is, therefore, waived.

**7.** Although we find that John is estopped from arguing that the after-tax values were improper, we note that Indiana case law does support the trial court's application of the after-tax values under these circumstances. In *In re Marriage of Mulvihill,* another panel of this Court concluded that the trial court did not abuse its discretion in allowing the tax deduction from the husband's retirement plan, noting that unless the husband died before retirement or before disability, the tax consequences were definite and not speculative. 471 N.E.2d 10, 14 (Ind.Ct.App.1984). *Mulvihill* was decided before Indiana Code Section 31–15–7–7, or its precursor Indiana Code Section 31–1–11.5–11.1, was enacted. However, after the enactment of Indiana Code Section 31–1–11.5–11.1, this Court noted that the rationale in *Mulvihill* was consistent with the statute. *Harlan,* 544 N.E.2d at 555. The Court of Appeals opinion was adopted by our supreme court. *Harlan,* 560

N.E.2d at 1246. We recognize, as the dissent points out, that the application of the after-tax values do not appear to fall squarely within the parameters set by Indiana Code Section 31–15–7–7, in that the taxes are not the direct or inherent and necessarily incurred consequences of the property distribution. *See id.* Yet, the supreme court did not disagree with this Court's stated acceptance of *Mulvihill.*

**8.** The trial court used the coverture fraction formula to divide the pension between the parties. Under this methodology, the value of the 401(k) plan is multiplied by a fraction, the numerator of which is the period of time during which the marriage existed (while rights were accruing) and the denominator is the total period of time during which rights accrued. *In re Marriage of Preston,* 704 N.E.2d 1093, 1098 n. 6 (Ind.Ct.App.1999).

John also asserts, and Nancy agrees, that in conclusion 14 the trial court erroneously listed the value of the 1996 Buick Roadmaster that it awarded to him as $6,950 instead of $6,590. Thus, $360 was attributed to John that he did not actually receive. Given that the trial court distributed assets to John and Nancy worth $356,356, however, we decline to remand for such a de minimis correction.

### C. Division of Marital Estate

 John contends that the trial court erred in deviating from an equal division of property.

The division of marital assets lies within the sound discretion of the trial court, and we will reverse only for an abuse of discretion. When a party challenges the trial court's division of marital property, he must overcome a strong presumption that the court considered and complied with the applicable statute, and that presumption is one of the strongest presumptions applicable to our consideration on appeal. We may not reweigh the evidence or assess the credibility of the witnesses, and we will consider only the evidence most favorable to the trial court's disposition of the marital property. Although the facts and reasonable inferences might allow for a different conclusion, we will not substitute our judgment for that of the trial court.

*DeSalle v. Gentry*, 818 N.E.2d 40, 44 (Ind. Ct.App.2004). Indiana law requires that marital property be divided in a "just and reasonable manner" and provides for the statutory presumption that "an equal division of the marital property between the parties is just and reasonable." Ind.Code § 31–15–7–5. This presumption may be rebutted, however, by relevant evidence that an equal division would not be just and reasonable. *See id.* If the trial court

determines that a party opposing an equal division has met his or her burden under the statute, the trial court must state its reasons for deviating from the presumption of an equal division in its findings and judgment. *Chase v. Chase*, 690 N.E.2d 753, 756 (Ind.Ct.App.1998).

While John baldly asserts that the trial court erred in awarding 60 percent of the marital estate to Nancy and 40 percent of the marital estate to him, the two arguments he presents are not relevant to the trial court's decision to deviate from an equal division. Rather, his arguments attack the trial court's attempt to effectuate its decision to divide the property unequally. First, he contends that the trial court did not actually provide him with 40 percent of the property because of the mistakes it made in valuing the retirement accounts and the Buick Roadmaster. However, we have found no reversible error in the trial court's valuation of marital property, and therefore this argument is moot.

Secondly, John asserts that he was twice penalized for the fact that Nancy's mother gifted $158,000 to Nancy during the marriage. He correctly notes that the trial court concluded that an equal distribution would not be just and reasonable for two reasons: (1) Nancy received $158,000 from her mother; and (2) Nancy was the principal wage earner and also the primary caregiver and housekeeper. John then states that the trial court again relied on the gift from Nancy's mother to justify the creation of the children's education trust fund. We are unpersuaded that the creation of the children's education trust fund, with a value of $69,826, penalized John any more than it could be said to penalize Nancy. Most of the parties' investments were intended to support their children's postsecondary education. Further, the children's trust represents only a portion of

the $158,000 gifted by Nancy's mother and the appreciation in value from the investments made with that money. In addition, John may still enjoy the benefit of these assets as he will receive 40 percent of any funds remaining in the trust when it terminates. Finally, the trial court did not base its unequal distribution solely on the fact that Nancy received $158,000 from her mother. Another important justification was that Nancy was the principal wage earner and the primary caregiver and housekeeper. The trial court found that John worked only about twenty-five hours a week for most of the marriage, and John does not challenge this finding. In contrast, Nancy worked fulltime during the marriage except during an interval after their second child was born when she worked parttime. Tr. at 176. In sum, we conclude that the trial court did not abuse its discretion in dividing the marital estate.

## II. Parenting Time Credit

John argues that the trial court erred in failing to apply parenting time credit to his child support obligation. Trial courts are vested with broad discretion in ruling on child support. *Dillon v. Dillon*, 696 N.E.2d 85, 87 (Ind.Ct.App. 1998). According to the Indiana Child Support Guidelines, parenting time credit begins at fifty-two overnights annually. Ind. Child Support Guideline 6. In other words, if a parent has fifty-one or fewer overnights annually, then that parent is not entitled to a parenting time credit. John had sixty-eight overnights, but each overnight was with one child rather than with all three. The trial court found that John would need 153 overnights with one child before he would be eligible for a parenting time credit based on the Indiana Child Support Guidelines.[9] John contends that since he had sixty-eight overnights, albeit with one child, he is entitled to two thirds of the credit he would be allowed if all three children spent the night. The Child Support Guidelines offer no direction for calculating parenting time credit when a parent spends overnights with fewer than all of his children. While it may have been permissible for the trial court to attribute parenting time credit to John in the manner he has described, we cannot say that the decision not to grant John a parenting time credit was an abuse of discretion.

## III. Attorney Fees

Indiana Code Section 31–15–10–1 provides that a trial court may order a party to pay a reasonable amount to the other party for the cost of maintaining or defending any action in dissolution proceedings. We review a trial court's award of attorney fees in connection with a dissolution decree for an abuse of discretion. *In re Marriage of Pulley*, 652 N.E.2d 528, 532 (Ind.Ct.App.1995), *trans. denied*. The trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before it. *McCullough v. Archbold Ladder Co.*, 605 N.E.2d 175, 180 (Ind.1993). When making such an award, the trial court must consider the resources of the parties, their economic condition, the ability of the parties to engage in gainful employment and to earn adequate income, and other factors that bear on the reasonableness of the award. *Hanson v. Spolnik*, 685 N.E.2d 71, 80 (Ind.Ct.App.1997), *trans. denied*. Consideration of these factors promotes the legislative purpose behind the award of attorney fees, which is to insure that a

---

**9.** Actually, assuming that fifty-two nights per child are required under the Child Support Guidelines, 156 overnights would be required before John would be eligible for parenting time credit.

party in a dissolution proceeding, who would not otherwise be able to afford an attorney, is able to retain representation. *Thompson*, 811 N.E.2d at 928. "When one party is in a superior position to pay fees over the other party, an award of attorney fees is proper." *Ratliff v. Ratliff*, 804 N.E.2d 237, 249 (Ind.Ct.App.2004). The trial court need not, however, give reasons for its determination. *Pulley*, 652 N.E.2d at 532.

Here, at the time of the dissolution, John was earning approximately $33,000 annually, and he was awarded marital assets valued at $144,063. These assets included eleven acres of property valued at $72,000, free and clear, and four cars. John has no house payment or car payment. Accordingly, we conclude that the trial court's decision not to award John attorney fees was not an abuse of discretion.

Affirmed.

SHARPNACK, J., concurs.

SULLIVAN, J., concurs in part and dissents in part with separate opinion.

SULLIVAN, Judge, concurring in part and dissenting in part.

I concur with respect to Parts I A, II and III. I respectfully dissent with respect to that portion of Part I B which concerns valuation of the pension and 401(k) plans and with Part C insofar as it concerns the distribution of those assets.

In my view, the trial court erroneously utilized the after-tax values to determine the value of the assets includable in the marital pot.

The majority decision gives substantial significance to the fact that John withdrew his objection to admission of the accountant's after-tax valuation of the pensions and 401(k) accounts. The withdrawal was premised upon a mistaken interpretation of the law. Counsel for John explained his withdrawal on grounds that the court "ha[d] to take into account what the *possible* tax effects might be under Indiana Case Law." Tr. at 156–157 (emphasis supplied).

Withdrawing the objection to the testimony concerning the after-tax value of the pensions and 401(k) accounts does not constitute a concession that those valuations might properly be used in determining the value of the assets to be included in the marital pot, as opposed to using those valuations in determining how to *distribute* the assets included in the pot. Notwithstanding that the evidence of both before-tax values and after-tax values was properly before the court, the court was nevertheless required to correctly apply the law to that evidence.

The controlling statute, I.C. § 31–15–7–7, as noted by the majority, provides that the court, "in dividing property under this chapter, shall consider the tax consequences of the property disposition with respect to the present and future economic circumstances...." The predecessor statute, Ind.Code § 31–1–11.5–11.1, which in pertinent part read identically to the present statute, was considered in *Harlan v. Harlan*, 544 N.E.2d 553 (Ind.Ct.App.1989). That Court of Appeals opinion was adopted by our Supreme Court. *Harlan v. Harlan*, 560 N.E.2d 1246 (Ind.1990). In doing so the Supreme Court noted that the husband's argument was that that statute compelled consideration of "potential tax liabilities associated with an asset being awarded to a party, even if the tax consequences are not immediate and definite." *Id.* Thus our Supreme Court rejected the husband's argument in this regard and approved the Court of Appeals' decision which clearly and unmistakably held:

"The thrust of the Statute is to recognize that there may be in the plan of division of marital property certain tax consequences which should be taken into account. The clear inference is that *only* tax consequences necessarily arising from the plan of distribution are to be taken into account, not speculative possibilities. The Statute specifically limits the trial court to consider only the tax consequences *'of the property disposition.'*" 544 N.E.2d at 555 (original emphasis).

Not only must the tax consequences considered be attributable to the plan of distribution of the marital assets, those tax consequences must be "direct or inherent and necessarily incurred tax consequences of the property distribution" and not "speculative possibilities." *Harlan*, 560 N.E.2d at 1246 (adopting the Court of Appeals decision at 544 N.E.2d at 555). *See also Dowden v. Allman*, 696 N.E.2d 456 (Ind.Ct.App.1998); *Knotts v. Knotts*, 693 N.E.2d 962 (Ind.Ct.App.1998), *trans. denied*; *Granger v. Granger*, 579 N.E.2d 1319 (Ind.Ct.App.1991), *trans. denied.*

Footnote 7 of the majority opinion implies that the *Mulvihill* case rested, at least in part, upon a rationale that after-tax consequences were to be considered in a dissolution property distribution even if those tax consequences were to be felt at some distant time in the future. Such perceived rationale is to the effect that only speculative consequences are to be disregarded and that if there will be some

tax consequences no matter how far into the future and no matter how and why those consequences are to be felt, such consequences are not speculative.

The *Mulvihill* court made its observation in this regard, only in attempting to distinguish *Burkhart v. Burkhart*, 169 Ind. App. 588, 349 N.E.2d 707 (1976). In the latter case this court affirmed the trial court's disallowance of a tax consequence factor because there was no "foreseeable need or requirement to liquidate the stock to comply with the [dissolution] property [distribution]." *Mulvihill*, 471 N.E.2d at 13 (citing *Burkhart*, 169 Ind.App. at 593, 349 N.E.2d at 711). In my view, the holdings of *Burkhart* and *Mulvihill* are incompatible to the extent that they differ as to what is and is not a speculative tax consequence.[10]

In this regard, and although I concurred in the Court of Appeals decision in *Harlan*, upon reflection, I am unable to agree with the *Harlan* conclusion that the 1985 enactment of the predecessor statute to the present statute was an affirmation of the rationale of *Mulvihill*. The statute, as noted in Harlan, most assuredly affirmed the rationale of *Burkhart* and also of *Wright v. Wright*, 471 N.E.2d 1240, 1245 (Ind.Ct.App.1984), which like *Burkhart* disallowed a tax consequence consideration which was not a direct result of the property distribution ordered. But the affirmation of the rationale of *Burkhart* and *Wright* necessarily and effectively under-

---

**10.** It is quite possible that the *Mulvihill* court was seizing upon a sentence in *Burkhart*, which in disallowing the tax consequence consideration, said: "This is not to say that the tax consequences are to be ignored." 169 Ind.App. at 593, 349 N.E.2d at 711. However, that sentence was made in the clear context of an entirely different scenario, one in which, because of cash flow problems, the asset would have to be sold, redeemed or transferred in order to satisfy the distribution

decree. In such instance, the tax consequences would not be speculative and would meet the requirement that the consequences be "direct or inherent and necessarily incurred" as a result of the property distribution. *Harlan*, 560 N.E.2d at 1246. The statement should not be construed to apply to cases in which a prospectively taxable transaction might or might not take place with regard to an asset distributed in the dissolution decree.

cut the validity of the decision in *Mulvihill*.

As noted, the controlling statute, I.C. 31–15–7–7, deals only with property distribution under Chapter 7 which concerns the "Disposition of Property and Maintenance" solely within the context of the Indiana Dissolution of Marriage Act. It does not embrace a distribution of property in a different context or setting, such as a distribution of a decedent's estate under the Probate Code or a distribution of corporate assets following a dissolution of the corporation. *See* Ind.Code 23–1–45–5, *et. seq.*

As also noted, the tax consequences to be considered upon such a marriage dissolution property distribution must not only be attributable to the plan of property distribution itself, but must be direct or inherent and necessarily incurred.

One might ask how such tax consequences can be direct or inherent and necessarily incurred unless such property distribution has been or is being made, or has been directed by a final order of the court. The question would then suggest that at the stage of the dissolution proceeding in which the court is merely enumerating and placing values upon the assets includable in the marital pot, there has been no dispositional plan or order set forth and that therefore, any contemplation of tax consequences is premature.[11]

The question and its possible implications are not, however, presented to us in this case. Its answer must accordingly await another case on another day.

In the final analysis, as to the valuation of the marital assets, I would reverse and remand to the trial court to value the pension and 401(k) plans at their respective pre-tax values and further to reconsider and perhaps reconfigure the distribution plan in order to achieve the intended 60%–40% division.[12]

---

11. A corresponding question could also be posed as to whether appropriate consideration of tax consequences attributable to a marital dissolution distribution of a pension plan or a 401(k) plan may be further restricted by the terms of the pension or 401(k) plan itself with respect to how and under what circumstances the asset may be distributed.

12. Because under my view the trial court would be reconsidering the valuation of the marital assets, it would be no additional burden for the court to correct the value placed upon the 1996 Buick Roadmaster and to modify the distribution plan accordingly.