FILED

Mar 06 2018, 9:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Russell Goodman, <br> *Appellant-Respondent,* <br><br> v. <br><br> Stephanie Goodman, <br> *Appellee-Petitioner.* | March 6, 2018 <br><br> Court of Appeals Case No. <br> 77A04-1706-DR-1300 <br><br> Appeal from the Sullivan Circuit Court <br><br> The Honorable Lakshmi Reddy, Special Judge <br><br> Trial Court Cause No. <br> 77C01-1502-DR-117 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, Russell Goodman (Husband), appeals the trial court's Order dissolving the marriage between Husband and Appellee-Petitioner, Stephanie Goodman (Wife).

We affirm.

# ISSUES

Husband presents us with seven issues on appeal, which we restate as:

(1) Whether the trial court abused its discretion by deviating from the presumption of an equal division of marital assets;

(2) Whether the trial court abused its discretion by omitting to offset the value of certain marital assets already in Wife's possession from the marital estate;

(3) Whether the trial court abused its discretion by including goodwill as a marital asset;

(4) Whether the trial court abused its discretion when valuating certain assets of the marital estate;

(5) Whether the trial court abused its discretion by awarding physical custody of the minor child to Wife;

(6) Whether the trial court abused its discretion by ordering Husband to pay child support retroactively; and

(7) Whether the trial court abused its discretion by ordering Husband to pay a portion of Wife's attorney fees.

# FACTS AND PROCEDURAL HISTORY

[4]     When divorce proceedings span more than half a decade, it is reasonable to assume that this was not an amicable breakup. Exploiting the judicial system to its fullest, the parties caused the trial court to enter two hundred and thirty-six entries in the chronological case summary since March 9, 2015 alone. Over the last two years, the trial court issued ninety-two orders and ten income withholding orders. Instead of aiding the trial court in reaching its decision by submitting the customary excel spreadsheet with the proposed allocation of assets, the trial court had to wade through a box of loose exhibits and puzzle together the parties' marital estate. We are very grateful for the detailed findings of fact and conclusions thereon issued by the trial court which brought this herculean task to an end.

[5]     Husband and Wife married on June 24, 1995, and both had children from previous relationships. While no children were born during the marriage, the parties adopted Husband's natural granddaughter, K.G., born on November 5, 2006. Around March 2012, Wife and K.G. moved out of the marital residence and Wife filed a petition for dissolution of marriage on March 12, 2012. On May 30, 2012, the trial court entered a joint temporary restraining order. On July 26, 2012, the parties submitted a Provisional Agreed Order, which was approved by the trial court on July 31, 2012, and which included the following provisions:

> a. [Wife] with primary custody of [K.G.] and [Husband] to exercise parenting time pursuant to the Indiana Parenting Time

Guidelines. [Husband] to pay child support in the amount of $110.00/week.

b. [Husband] to have temporary possession of the marital residence at 7834 S. Pleasant Main, Carlisle, Indiana 47838 and shall not be permitted to allow any other individuals to reside within the marital residence until further order by the court.

c. [Husband] shall be responsible for all debts in his name individually and all debts associated with the business A1 Affordable Goodman's Tree Service. [Wife] shall be responsible for all debts in her name individually and any joint debts shall be allocated at the final hearing.

d. [Wife] was to be paid $9,500.00 for the Chevy Camaro within ten (10) days from July 5, 2012, and if she was not paid, then the parties were to trade and/or sell said vehicle to a dealership for a vehicle of [Wife's] choosing and [Wife] was to maintain full possession and title of the new vehicle of her choosing. If any financing was required, [Wife] would be responsible for the debt associated with the new vehicle.

e. The parties were to inventory the personal items within the marital residence and amicably divide temporary possession of the personal property and if they were unable to agree, then the property was to remain in the marital residence. [Wife] was entitled to her clothes, [K.G.'s] toys, and [K.G.'s] bedroom suite.

f. [Husband] shall be responsible for the operation and expense of A1 Affordable Goodman's Tree Service. [Husband] shall be entitled to temporary possession of all assets of A1 Affordable Goodman's Tree Service in order to dutifully operate said business.

(Trial Court's Order, p. 5).

[6] For the next five years, the parties engaged in fierce and relentless litigation, filing more than one-hundred-and-seventy pleadings resulting in the issuance of ninety-two orders. Finally, by agreement, the marriage was dissolved on December 2, 2015, with bifurcation of the issues regarding the division of marital assets, apportionment of marital debt, and establishment of custody, parenting time, and K.G.'s support arrangements. On December 4, 2015, Wife filed a Verified Motion for Order to Produce Documents, contending that Husband failed to respond to discovery requests and produce the requested documents. Wife alleged that she requested discovery on August 14, 2015 and on August 24, 2015, but each time Husband produced the same non-responsive and handwritten responses without attaching the supporting documents. The discovery dispute was never resolved as Wife continued to indicate that she did not receive all the documents requested and Husband argued that he properly responded and produced all documents in his possession.

[7] The trial court conducted a final hearing over seven non-consecutive days: May 15 & 27, 2016, August 22 & 23, 2016, December 14, 2016, and February 22, 2017. During these hearings, the trial court received evidence concerning Husband's one-hundred-and-six pleadings filed over the past two years and Wife's sixty-four pleadings filed in the same time period. The evidence presented during the proceedings reflected that during the marriage, Husband and Wife both worked in their tree trimming business. Despite receiving an income from the business, the family was on government health insurance,

received food stamps, and qualified for free/reduced school lunches and textbooks. Testimony suggests that Husband had complete and total financial control during the marriage over the parties' personal and business possessions, with ownership of all property placed in his name.

[8] Both Husband and Wife were gamblers: they often purchased lottery tickets and visited the casino in Evansville. Over the years, Husband accrued significant winnings from gambling. In 2009, Husband won a scratch off lottery ticket in the amount of $100,000. While Wife testified that there was at least $70,000 left in a lock box at the time of filing the divorce proceeding, Husband claimed that he and Wife lost all the money gambling, eating in five star restaurants, and purchasing a $20,000 Camaro for Wife. Family members stated that Husband would often hide money in shoe boxes and mattresses and kept a very low balance in a checking account.

[9] Despite having received parenting time in accordance with the Indiana Parenting Time Guidelines, by February 2015, Wife was always present during Husband's parenting time. The Guardian ad Litem (GAL) noted, in a February 2015 report, that the parties frequently did things together as a family. Wife indicated that she attended the visits because K.G. was afraid to stay alone. However, after two *in camera* interviews of K.G., the trial court did not find evidence that K.G. was fearful of Husband, "but did determine that [K.G.] has been coached and influenced by [Wife]." (Trial Court Order, p. 28). The trial court clarified that "[m]uch like [Husband] has engaged in a pattern and behavior of hiding financial assets, the [c]ourt believes that [Wife] has been less

than truthful in [K.G.'s] feelings towards her father and has tried to discourage and prevent a meaningful relationship between [K.G.] and [f]ather." (Trial Court's Order, p. 29).

[10] On May 16, 2017, after receiving evidence for seven days, the trial court issued its Order, spanning forty-nine pages, including one-hundred and sixty findings of fact and ninety conclusions of law. The trial court concluded, in pertinent part, as follows:

> 6. This [c]ourt deviates from the presumption of equal division of assets because there is such a large disparity of income and because [Husband] has engaged in dissipation of assets. While [Husband's] income tax returns for several years provide that his income was nominal and a net income of less than $20,000, this [c]ourt finds that to be contrary to the evidence presented. Documentation submitted by [Wife] for the year 2013, demonstrates that [Husband] was receiving checks in large amounts written in his individual name and that [Husband] cashed these checks at the payor's bank, rather than depositing into his business account. [Husband] did not provide any bank statements to rebut this or to show where these checks were deposited and how the money was used. The [c]ourt also believes that [Husband] engaged in dissipation of assets because he has no real good explanation of what happened to all his lottery and casino winnings or engaged in dissipation of assets by using such large amounts of discretionary income to gamble rather than paying debts, timely paying child support, or have some type of savings for their future. In addition, the [c]ourt believes that [Husband] has engaged in a pattern of hiding assets and not turning over documentation that was reasonably requested on numerous occasions and the [c]ourt believes that there are assets that [Husband] has not disclosed and so an

unequal distribution seems only reasonable and fair under the circumstances.

7. For the foregoing reasons, the [c]ourt awards [Wife] Sixty Percent (60%) of the assets and [Husband] Forty Percent (40%). [Husband] can continue to earn tremendous income through his business as he has done for decades and/or through his gambling efforts which he appears to be very successful at based upon his income tax returns. His income tax returns are not reflective of all his gambling winnings and may not be reflective of any lottery winnings. Any and all debts in [Husband's] name and any and all business debts shall be the responsibility of [Husband] as the [c]ourt finds no reasonable explanation for these debts not to have been paid when he had so much discretionary income to gamble.

* * * *

24. The total value of marital assets to be allocated is Three Hundred Thirty Two Thousand Eight Hundred Thirty Nine and 00/100 Dollars ($332,839.00). In order to provide [Wife] with 60% of the marital assets, [Huband] will have to make an equalization payment to [Wife] in the amount of One Hundred Ninety Nine Thousand Seven Hundred Three and 40/100 Dollars ($199,703.40). Because this matter has been pending for five (5) years, the [c]ourt believes that the best course of action and to conserve judicial economy so the parties are not constantly returning to [c]ourt for collection purposes, the [c]ourt hereby reduces this property settlement to a judgment . . .

* * * *

31. [] A trial court has discretion to make a modification of child support relate back to the date the petition to modify is filed, or any date thereafter. The [c]ourt sees no reason to use any other

date for child support modification other than the date that [Wife] filed her Petition to Modify. Accordingly, the child support is modified retroactive to May 24, 2013.

* * * *

33. Accordingly, [Husband's] child support payment of $320/week is modified retroactive to the date of filing, which is May 24, 2013. Because it took the parties so long to reach the point where they could litigate this issue, [Husband] now has a substantial arrearage. As stated already, the reason for this long delay rests with the actions of both parties. [Husband] repeatedly failed to fully respond to discovery requests and provide necessary financial information, which to this day has still not been produced. [Wife] was not diligent on numerous occasions on bringing the matter to the [c]ourt's attention until just days before a scheduled hearing making it too late to attempt to remedy the dispute before having to continue and reschedule hearings. Additionally, [Husband] made efforts to hide assets and/or dissipate assets and knowing how much income he was earning, [Husband] should have known all along that his child support should have been significantly more than the $110/week.

* * * *

51. [Wife] is hereby awarded sole legal custody due to the inability of the parties to communicate in any reasonable and effective manner. However, [Husband] has the right to all information regarding [K.G.] and [Wife] is to follow the recommendations of GAL [] to insure that [Husband] has all such information and that the school and medical providers have his contact information. [Wife] is hereby cautioned that it will reflect negatively on her if the [c]ourt discovers that [Wife] is failing or refusing to provide school, medical, extra-curricular or relevant information regarding [K.G.] to [Husband]. It would be

in [K.G.'s] best interest if someday these parties reach a point where they can better communicate and both be involved in important decisions regarding [K.G.].

52. [Wife] is hereby awarded primary physical custody.

* * * *

59. The [c]ourt believes that it is time for [Husband] to have unsupervised parenting time with [K.G.] as there does not appear to be any basis for supervised parenting time to continue. That there has been the opinion of the GAL which the [c]ourt has adopted. However, much time has lapsed and the [c]ourt provides for a short transition period. The [c]ourt EXPECTS [Wife] to cooperate and allow this relationship to be rebuilt and not to engage in action that causes [K.G.] to be in fear of her father. Children thrive when they have a relationship with both parents and they both chose to adopt [K.G.] together and must now figure out how to co-parent effectively and successfully.

* * * *

64. [Husband] submitted an Affidavit for Attorney Fees in the amount of over Fifty Thousand and 00/100 Dollars ($50,000.00) requesting reimbursement. [Husband] also filed a Notice of Lien of Attorney Fees for over $27,000.00. The [c]ourt DENIES [Husband's] request for attorney fees.

65. [Wife] submitted an Affidavit for Attorney Fees in the amount of over One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00) requesting reimbursement. The legal fees expended by [Wife] are significantly high in comparison to the assets available to the parties and the [c]ourt could not possibly award fees in that amount. The legislative purpose behind

authorizing a [c]ourt to order one party to pay another party's attorney fees is to ensure that party to a dissolution proceeding has access to an attorney who would not otherwise be able to afford it. In determining whether to award one party attorney fees, the court looks at the economic circumstances of the parties, the ability of the parties to engage in gainful employment to earn adequate income, and any other pertinent factors. In this circumstance, [Wife] has no income by which she could have afforded an attorney and would not have been able to present her case without an attorney. [Husband] complicated and delayed the process by not producing proper discovery responses and documents. However, the [c]ourt must be reasonable in the fees awarded and the [c]ourt takes into account that she has been awarded a property settlement. Based on the foregoing, the [c]ourt awards [Wife's] attorney's fees in the amount of Twenty-Five Thousand and 00/100 Dollars ($25,000.00) and those fees shall be reimbursed by [Husband]. [Husband] shall have one hundred and twenty (120) days to reimburse [Wife's] counsel. [Husband] is instructed that he needs to find a good method of keeping track of his payments, such as utilizing checks or cashier's checks rather than cash that cannot be accounted for.

(Trial Court's Order, pp. 30-31, 34, 35, 36, 40-41, 42, 43).

[11] Husband now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[12] After the final hearing, the trial court entered findings of fact and conclusions thereon regarding the parties' dissolution proceedings. In reviewing an order in which the trial court makes findings of fact and conclusions thereon, our standard of review is well-settled. First, we determine whether the evidence

supports the findings and second, whether the findings support the judgment. *Troyer v. Troyer*, 987 N.E.2d 1130, 1134 (Ind. Ct. App. 2013), *trans. denied*. In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. *Id.* We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. *Id.* Challengers must establish that the trial court's findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced a mistake has been made. *Id.* Additionally, a judgment is clearly erroneous under Indiana Trial Rule 52 if it relies on an incorrect legal standard. *Id.* We evaluate questions of law *de novo* and owe no deference to a trial court's determination of such questions. *Id.* Thus, on appeal, we "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A).

## II. *Division of Marital Property*

[13] Challenging the trial court's division of marital property, Husband contends that the trial court improperly based its deviation from an equal division on its findings that he dissipated marital assets and the disparate income between the parties. A trial court has broad discretion in dividing the marital estate, and we will reverse a trial court's decision only for an abuse of discretion. *O'Connell v. O'Connell*, 889 N.E.2d 1, 10 (Ind. Ct. App. 2008). The "party challenging the trial court's division of marital property must overcome a strong presumption

that the trial court considered and complied with the applicable statute, and that presumption is one of the strongest presumptions applicable to our consideration on appeal." *Id.* On review, we will neither reweigh evidence nor assess the credibility of witnesses, and "we will consider only the evidence most favorable to the trial court's disposition of the marital property." *Id.*

[14] In dissolution proceedings, the trial court is required to divide the property of the parties "in a just and reasonable manner." Ind. Code § 31-15-7-4(b). This division of marital property is a two-step process. *See O'Connell*, 889 N.E.2d at 10. First, the trial court must ascertain what property is to be included in the marital estate; second, the trial court must fashion a just and reasonable division of the marital estate. *Id.* The "one-pot" theory—*i.e.*, that all property acquired before or during the marriage is to be included in the marital estate— ensures "that all assets are subject to the trial court's power to divide and award. *Id.* While the trial court may ultimately determine that a particular asset should be awarded solely to one spouse, it must first include the asset in its consideration of the marital estate to be divided." *Id.* at 11 (quoting *Hill v. Hill*, 863 N.E.2d 456, 460 (Ind. Ct. App. 2007)).

[15] In determining how to divide a marital estate, the trial court "shall presume that an *equal* division of the marital property between the parties is just and reasonable." I.C. § 31-15-7-5 (emphasis added). However, this is a rebuttable presumption, and a party may present relevant evidence to establish that an equal division would not be just and reasonable. I.C. § 31-15-7-5. The trial

court may consider evidence of the following factors in concluding whether it would be appropriate to deviate from the presumption of an equal division:

(1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.

(2) The extent to which the property was acquired by each spouse:

(A)Before the marriage; or

(B) Through inheritance or gift.

(3) The economic circumstances or each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court considers just to the spouse having custody of any children.

(4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.

(5) The earnings or earning ability of the parties as related to:

(A) A final division of property; and

(B)A final determination of the property rights of the parties.

I.C. § 31-15-7-5.

[16] Here, the trial court found that Wife rebutted the presumption and awarded 60% of the marital estate to her. In support of its decision to deviate from the presumption of an equal division, the trial court relied on the evidence littered throughout the proceedings that Husband dissipated the marital estate by gambling and the extensive documentation and testimony that Husband was not completely forthcoming in reporting his income, including in his lottery and casino winnings.

### 1. *Dissipation of Marital Assets*

[17] We have previously stated,

> Fault is not relevant in dissolution proceedings except as related to the disposition or dissipation of marital assets. One spouse's claim of improvident spending by the other spouse can be a powerful weapon in an attempt to secure a larger share of the marital estate.

*In re Marriage of Coyle*, 671 N.E.2d 938, 942 (Ind. Ct. App. 1996). "Waste and misuse are the hallmarks of dissipation. Our legislature intended that the term carry its common meaning denoting 'foolish' or 'aimless' spending. Dissipation has also been described as the frivolous, unjustified spending of marital assets which includes the concealment and misuse of marital property." *Id.* at 943. Factors to consider in determining whether dissipation has occurred, include: (1) whether the expenditure benefited the marriage or was made for a purpose entirely unrelated to the marriage; (2) the timing of the transaction; (3) whether the expenditure was excessive or *de minimis*; and (4) whether the dissipating

party intended to hide, deplete, or divert the marital asset. *Goodman v. Goodman*, 754 N.E.2d 595, 598 (Ind. Ct. App. 2001).

[18] Although both parties did gamble during the marriage, the evidence establishes that Husband had complete and total financial control over all assets, including the gambling winnings. Wife submitted documentary evidence that between 2006 and 2010, Husband earned $140,961 in gambling winnings. After Wife filed for divorce in 2012, Husband's gambling winnings through 2015 amounted to $200,639. Yet, during the marriage, Husband had complete control over the finances and only allocated a little bit of money to Wife on a weekly basis to help with the household expenses. The family was on government health insurance, received food stamps, and K.G. received a free/reduced lunch and textbooks at school. After the separation and institution of an initial child support order, Husband failed to contribute to the payment of the marital debts and incurred a significant debit on his child support obligations. Instead, Husband testified that while he was in prison from December 2012 through May 2013, he helped other inmates buy supplies and pay their attorney fees. A more egregious example of dissipation would be hard to come by.

### 2. *Disparate Income*

[19] Husband also claims that no true earning disparity exists between him and his Wife. Focusing on the tax returns, he asserts that his reported income is barely higher than Wife's annual earnings of $30,368. However, the record is littered

with testimony of Husband's attempts to hide his assets. Several witnesses testified about Husband's habits of carrying large sums of cash with him and counting wads of money on the kitchen island. At times, this cash alone amounted to $16,000. In his business dealings, Husband would encourage customers to pay cash or make checks payable in his name. Husband would then cash the check at the customer's bank so the income was never shown in his business records or deposited in his business bank account. Another witness testified that Husband had informed him that the business income in 2014 was $420,000, and $480,000 in 2015. Based on the exhibits submitted by Wife and witness testimony, we agree with the trial court's finding that "it is reasonable to conclude that in 2013, [Husband] cashed checks and received cash payments in the amount of $160,458.12," which he failed to report as income. (Trial Court's Order, p. 13).

[20] Without any supporting references to the voluminous record, Husband asserts that the trial court also failed to account for the payments made to his business partner, which would reduce his purported business income. However, our review indicates that Husband's business partner is his adult daughter from a previous marriage, who testified that even though she is the half-owner of the business on paper, she received no income from the business but instead relies on public assistance to meet her own living expenses.

[21] Considering the evidence most favorable to the trial court's division of marital property, and the wealth of evidence that Husband was less than forthcoming about his income, we conclude that Wife rebutted the presumption of an equal

division of marital assets and a deviation from an equal split was warranted. We affirm the trial court's award of 60% of the marital estate to Wife.

### III. *Offsetting the Value of Certain Assets*

[22] Next, Husband contends that the trial court abused its discretion by omitting to offset the value of certain assets to Wife in its calculation of the respective shares of the marital estate. Pointing to the Agreed Provisional Order entered into by the parties on July 5, 2012, Husband argues that the trial court failed to credit Wife's share of the marital estate with the value of the Camaro and the personal property in her possession.

[23] With respect to the Camaro, the Provisional Agreed Order provided Husband with the option to either keep the Camaro himself and pay Wife $9,500 to purchase a vehicle or to sell or trade in the Camaro, allowing Wife $9,500 from the sale or trade to purchase a vehicle. During the final hearing, Wife testified that Husband elected to trade in the vehicle and pay off the balance of $18,759.67 on the car loan. Husband affirmed that he was able to pay off the balance with the trade-in amount received for the Camaro and had only $500 left over. Although the parties never explicitly testified to it, a reasonable inference can be made that in light of the high debt still remaining on the vehicle at the time of trade-in, Wife never received the $9,500 she was due to be paid after trading in the Camaro, or received a vehicle of her choice.

[24] Husband makes a similar argument with respect to the personal property valued at $13,510. The Provisional Agreed Order alluded to a future amicable division

of the marital property with the exception of Wife's clothing, and K.G.'s toys and bedroom suite which were awarded to Wife in 2012. The Agreed Order required the parties to inventory the personal items remaining within the marital residence and if the parties were unable to agree about their ownership, the property was to remain in the marital residence, which was temporarily awarded to Husband. Despite a prohibition to remove the personal property from the marital residence, Husband admitted to having relocated some of the property. Nevertheless, during the final hearing, Husband submitted an appraisal of the personal property left in the marital residence in the amount of $13,510. Absent any other evidence submitted by either party, and based on the fact that Husband had control over the marital residence, the trial court could reasonably infer that this personal property was in Husband's possession and should properly be credited to him.

## IV. *Goodwill*

[25] With respect to the division of the business assets, Husband contends that the trial court abused its discretion by including the business' goodwill into the calculation of the marital estate and by assigning him the totality of the business' debts.

[26] In *Yoon v. Yoon*, 711 N.E.2d 1265, 1268-69 (Ind. 1999) (internal citations omitted), our supreme court analyzed the issue of goodwill as follows:

> Goodwill has been described as the value of a business or practice that exceeds the combined value of the net assets used in the business. Goodwill in a professional practice may be

attributable to the business enterprise itself by virtue of its existing arrangements with suppliers, customers or others, and its anticipated future customer base due to factors attributable to the business. It may also be attributable to the individual owner's personal skill, training or reputation. This distinction is sometimes reflected in the use of the term "enterprise goodwill," as opposed to "personal goodwill."

Enterprise goodwill "is based on the intangible, but generally marketable, existence in a business of established relations with employees, customers and suppliers." Factors affecting this goodwill may include a business's location, its name recognition, its business reputation, or a variety of other factors depending on the business. Enterprise goodwill is an asset of the business and accordingly is property that is divisible in a dissolution to the extent that it inheres in the business, independent of any single individual's personal efforts and will outlast any person's involvement in the business. It is not necessarily marketable in the sense that there is a ready and easily priced market for it, but it is in general transferrable to others and has a value to others.

\* \* \* \*

In contrast, the goodwill that depends on the continued presence of a particular individual is a personal asset, and any value that attached to a business as a result of this "personal goodwill" represents nothing more than the future earning capacity of the individual and is not divisible. \* \* \* \*

The General Assembly has determined that the "relative earning power" of the parties is not a divisible asset because it is not property, but may be considered in determining the percentage of property to be given to each. Accordingly, we join the states that exclude goodwill based on the personal attributes of the individual from the marital estate.

[27] In its identification and quantification of enterprise goodwill, the trial court concluded that:

> As the parties were married for nearly seventeen (17) years before the date of filing and the testimony was clear that [Wife] participated heavily in the administrative side of the business which was a significant role and she continued to participate in the business on occasion through 2015, this [c]ourt believes it is appropriate to assign some value to goodwill, especially when there is no business valuation, no true inventory of business assets along with value, and so much dispute as to what the business is worth.

> The parties did a poor job of reporting income and keeping track of income and business expenses. It is difficult to ascertain how much of a role [Wife] played independently or whether she was coerced into this business practice, but it appears that [Husband] has continued to engage in the same business practice after the date of filing. He continued to purchase business equipment in his individual name, sometimes he places title in his children's names, and often pays cash. This [c]ourt really does not have an accurate way to value the business so has determined that the best it can do is take what it believes to be the annual net income and divide that in half to assign a goodwill value to the business. [Wife] would then he entitled to 60% of that figure.

(Trial Court's Order, p. 33) (footnote omitted).

[28] In an effort to challenge the trial court's conclusion of enterprise goodwill, Husband contends that the survival of the business is dependent on his continued presence. In support of his argument, he focuses on his habit to title business assets in his personal name, pay his employees in cash, and accept customer checks written to Husband personally instead of the business entity.

We find that this evidence rather establishes Husband's propensity to intermingle personal and business assets and points towards an inference of hiding assets.

[29] To the contrary, we find that the record supports the trial court's conclusion. As noted by the trial court, Wife continued her involvement with the administrative side of the business for several years after filing for dissolution. Wife's adult son from a previous marriage testified that he worked in the parties' business for about ten years in a supervisory position with financial responsibilities. Likewise, Husband's adult daughter from a previous marriage informed the trial court that Husband at times would place business assets in her name and even though she was made co-owner of the tree trimming business she received no income. Accordingly, as the business was "transferable" to other family members and thus "independent" of Husband's "personal efforts," we affirm the enterprise goodwill in the amount of $76,748. *See Yoon*, 711 N.E.2d at 1268.

[30] Continuing to dispute the trial court's division of the parties' business, Husband claims that the trial court abused its discretion by finding that "Husband must pay business debt totaling $46,438.00 because he should have been paying off debt during the marriage instead of gambling." (Appellant's Br. p. 34). The record indicates that after the marriage, Wife became a homemaker and assisted Husband's business by soliciting work, scheduling jobs, and accounting services. Even after she filed for dissolution, Wife continued her involvement in Husband's tree trimming business. While Wife worked in the business for more

than twenty years, she received no income. Considering the evidence in the record that Husband interpreted the business to be his own personal fiefdom in which he could intermingle personal and business assets as well as the absence of any salary for Wife's employment in the business, we find that the assignment of all business debt to Husband was "just and reasonable." *Crider v. Crider*, 26 N.E.3d 1045, 1048 (Ind. Ct. App. 2015). Although the trial court based its finding on a different ground—Husband's gambling habit—we will not reverse the trial court's Order with respect to the business debts as it does not amount to a prejudicial error. *Riehle v. Moore*, 601 N.E.2d 365, 369 (Ind. Ct. App. 1992) ("[W]e may reverse a trial court's judgment only if its findings constitute prejudicial error. A finding of fact is not prejudicial to a party unless it directly supports a conclusion of law adverse to him.)

## V. *Valuation Date*

[31] Husband's final argument with respect to the marital property relates to three specific assets, which, according to Husband, were not in existence on the valuation date and therefore should not have been included in the marital pot.

[32] Generally, the marital pot closes on the day the petition for dissolution is filed. *Sanjari v. Sanjari*, 755 N.E.2d 1186, 1192 (Ind. Ct. App. 2001). The date of filing is defined by statute as the date of "final separation." I.C. § 31-9-2-46. When dividing property in a dissolution proceeding, the court shall include property owned by either spouse prior to the marriage, acquired by either spouse in his or her own right after the marriage and before the final separation

of the parties, or acquired by the joint efforts by the spouses. I.C. § 31-15-7-4(a).

[33] After identifying the marital assets, the trial court has discretion to set any date between the date of filing the dissolution petition and the date of the hearing for their valuation. *Eyler v. Eyler*, 492 N.E.2d 1071, 1074 (Ind. 1986). "The selection of the valuation date for any particular asset has the effect of allocating the risk of change in the value of that asset between the date of the valuation and date of the hearing. *Quillen v. Quillen*, 671 N.E.2d 98, 103 (Ind. 1996). We entrust this allocation to the discretion of the trial court. *Id.*

[34] Husband first contends that the trial court abused its discretion when it included the marital residence and the real estate on which it is located in the marital estate even though the property was owned by Husband's adult daughter from a previous marriage. The evidence reflects that even though ownership of the residence and real estate was in name transferred to Husband's daughter, Husband and Wife continued to reside in the house for several years, Husband continued to pay the taxes, and remodeled the property several years after Wife filed for dissolution. Husband's daughter testified that she never claimed the residence as her own nor paid its taxes and in fact was living in subsidized housing. Although Wife moved to join Husband's adult daughter into the proceedings on December 7, 2015, the trial court denied the motion, ordering Husband's daughter to be called as a witness. Instead, viewed in light of the overwhelming evidence in the record of Husband hiding assets, we agree with the trial court that the property transfer was "just a scheme to keep assets from"

Wife. (Trial Court's Order, p. 32). Therefore, it was properly included in the marital pot.

[35] In 2009, Husband won $100,000 with a scratch off ticket. Husband claims that the entire winnings were expended prior to the dissolution and should not have been included in the marital assets in the amount of $70,000. Husband testified that the lottery winnings, which had been placed in a lockbox, purchased Wife's Camaro for $20,000, with the remainder spent on gambling and eating at five star restaurants. Mindful of the Camaro's purchase price and the parties' other expenditures, we conclude that the trial court's valuation of the asset at $70,000 was reasonable and we will not disturb its decision.

Lastly, Husband disputes the trial court's inclusion of his 2013 gambling winnings in the amount of $42,694. He claims that because the dissolution was filed in 2012, the 2013 winnings are not part of the marital assets. However, Husband intermingles the identification of marital assets with their valuation. The record is overflowing with references to the parties' gambling during the marriage. Wife submitted documentary evidence that between 2006 and 2010, Husband earned $140,961 in gambling winnings. As these amounts were "acquired after the marriage and before the final separation of the parties," they are part of the marital estate. I.C. § 31-15-7-4(a). As they are part of the marital pot, the valuation of these gambling winnings falls within the discretionary province of the trial court, which we will not disturb absent an abuse of discretion. *See Quillen*, 671 N.E.2d at 103.

[36] The trial court valued the gambling winnings at their 2013 amount and reasoned that

> [t]he [c]ourt does not utilize [Husband's] 2012 tax return as that is the only year in which he had negative income and the [c]ourt questions whether this was intentional due to the fact that the Petition for Dissolution was filed in the year 2012. This conclusion is based on the evidence of [Husband's] attempt to hide assets and observations of him over the course of seven (7) days for [f]inal [h]earings and a few other hearings. Accordingly, the [c]ourt used information from 2013.

(Trial Court's Order, p. 33). "So long as there is sufficient evidence and reasonable inferences to support the valuation, an abuse of discretion does not occur." *Id*. at 103. Nevertheless, Husband now posits that the trial court omitted "to account for gambling losses and tax consequences." (Appellant's Br. p. 38). However, the trial court noted that "Father did not introduce evidence that these losses needed to be deducted from the winnings. He also did not introduce evidence of the amount of all his other winnings because testimony revealed [Husband] could have had winnings not included in the W2G total." (Trial Court's Order, p. 15). "Where the parties fail to present evidence as to the value of assets, it will be presumed that the trial court's decision is proper." *Id*. at 103. We affirm the trial court.

## VI. *Custody of K.G.*

[37] Moving away from the marital assets and now turning towards the minor child, Husband advocates for a change in custody. He advances that the trial court

abused its discretion by awarding physical custody of K.G. to Wife as Wife "has actively tried to poison K.G. against her [f]ather," and her best "interests would be served by being in the custody of her [f]ather." (Appellant's Br. p. 46).

[38] Pursuant to Indiana Code section 31-17-2-8, the trial court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the best interests of the child, there is no presumption favoring either parent; instead, the court shall consider all relevant factors, including the following:

> (1) The age and sex of the child.
> (2) The wishes of the child's parent or parents.
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
> (4) The interaction and interrelationship of the child with:
>     (A) The child's parent or parents;
>     (B) The child's sibling; and
>     (C) Any other person who may significantly affect the child's best interests.
> (5) The child's adjustments to the child's:
>     (A) Home;
>     (B) School; and
>     (C) Community.
> (6) The mental and physical health of all individuals involved.
> (7) Evidence of a pattern of domestic or family violence by either parent.
> (8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(b) of this chapter.

I.C. § 31-17-2-8. As our supreme court has held:

> The court must consider factors that are relevant, including but not limited to those explicitly listed in the statute. Although a

court is required to consider all relevant factors in making its determination, it is not required to make specific findings. A trial court's custody determination is reviewable only for an abuse of discretion. An abuse of discretion occurs where the decision is clearly against the logic and effect of the evidence before the court.

*Russell v. Russell*, 682 N.E.2d 513, 515 (Ind. 1997) (footnote and citations omitted).

[39] Out of the 160 findings made by the trial court, 24 deal with the custody issue; and out of the 90 trial court conclusions, 14 involve K.G.'s custody. Even though Husband contends that Wife maintained a persistent pattern of preventing his parenting time and tried to discourage a relationship with his minor child, the record and Order—including two *in camera* interviews with K.G.—both demonstrate that the trial court carefully considered these allegations, as well as a multitude of others, in ensuring that its custody decision would be in K.G.'s best interests. Husband now merely asks that we reweigh all this evidence in his favor. As the trial court's order clearly reflects that it gave proper consideration to the statutory facts when determining the custody arrangement that was in K.G.'s best interests, we conclude that the trial court acted within its discretion in awarding primary physical custody to Wife.

## VII. *Child Support*

[40] Next, Husband challenges the trial court's increase of his child support obligation and its retroactive application to the date of filing for the modification of child support on May 24, 2013. Despite evidence that Husband

gave the family barely sufficient money to support the basic necessities to survive, Husband now incredibly claims that "[t]he [r]ecord reveals this child lived in a manufactured home, attended public school and relied on social services for basic needs. Far from living a lifestyle of the rich and famous, K.G. ha[d] *a normal middle-class existence.*" (Appellant's Br. p. 55) (internal reference omitted, emphasis added). As such, Husband maintains that the current weekly support obligation of $330 is too high compared to the standard of living K.G. enjoyed during the marriage of the parties.

[41] As part of the divorce proceedings between two parents of a child, the trial court may order either of them "to pay any amount reasonable" for the child's support. I.C. § 31-16-6-1. A trial court's calculation of child support is presumptively valid and its decision will only be reversed if it is clearly erroneous or contrary to law. *Young v. Young*, 891 N.E.2d 1045, 1047 (Ind. 2008). Child support calculations are made utilizing the income shares model set forth in the Indiana Child Support Guidelines. *Sandlin v. Sandlin*, 972 N.E.2d 371, 374 (Ind. Ct. App. 2012). The guideline approach is promulgated in Indiana Code section 31-16-6-1, which considers, among other things, the standard of living the child would have enjoyed if the marriage had not been dissolved and the financial resources and needs of the noncustodial parent. *Nikolayev v. Nikolayev*, 985 N.E.2d 29, 33 (Ind. Ct. App. 2013).

In making its calculation, the trial court concluded

> 31. [Wife's] petition of modify child support was filed on May 24, 2013 and a hearing was never conducted on that Petition nor

was a decision ever rendered. It could not have been issued any earlier without the introduction of evidence which took place during the days of the [f]inal [h]earing. Perhaps if [Husband] had been transparent about his gambling winnings and income generated but not shown as business income, the issue of child support could have been resolved much earlier. []

32. Because the most accurate information that the [c]ourt has is related to 2013 and [Wife's] Petition to Modify was filed on May 24, 2013, the [c]ourt utilizes income information for 2013 in calculating child support. As stated above, [Husband's] business income in 2013 was $153,495. However, child support is based on all income received and the gambling/lottery winnings are income. By adding the $42,694.00 gambling winnings in 2013, [Husband's] income in 2013 was $196,189.00 which is the equivalent of $3,772.86/week. [Wife] was working as a waitress at that time and her income is imputed at minimum wage. Attached in a child support obligation worksheet identified as Exhibit B which includes what the [c]ourt most accurately reflects the parties' income in 2013 and shows that [Husband's] child support in 2013 would have been $320/week.

(Trial Court's Order, p. 36).

[42] Acknowledging that this new child support order represents a considerable increase from the temporary 2012 order of $110/week, the trial court emphasized Husband's efforts to hide assets and the overwhelming evidence that Husband earned far more than disclosed in his tax returns. During the marriage, Husband controlled the purse strings, forcing the family to survive on food stamps, rely on government health care, and free school lunches while he went gambling, played the lottery, and had large amounts of cash in his possession. Even though Husband "never gave [Wife] money and she may not

have been living at a standard commensurate with the amount of income that [Husband] was generating, [] that should not deprive [K.G.] of now being able to live at a standard that is commensurate with the earnings of the parties." (Trial Court's Order, p. 38).

[43] In light of Husband's challenge to the retroactive application of the trial court's child support order, we note that it is well established that "the trial court has the discretionary power to make a modification for child support relate back to the date the petition to modify is filed or any date thereafter chosen by the trial court." *Laux v. Ferry*, 34 N.E.3d 690, 695 (Ind. Ct. App. 2015). Here, the trial court elected to relate Husband's obligation back to May 24, 2013, the date the petition to modify was filed.

[44] Trial courts make case-by-case determinations regarding weekly gross income from self-employment and impute income for the purpose of computing child support based on specific circumstances as they exist or are presented to the court. Our standard of review is flexible enough to permit the trial court to fashion a child support order that is tailored to the circumstances of the particular case before it and consequently reflects its best judgment. Given Husband's propensity to hide his assets, his discretionary money to gamble extensively while not paying child support, and his business dealings, we conclude that the trial court properly calculated Husband's child support obligation.

VIII. *Attorney Fees*

As a final issue, Husband contends that the trial court abused its discretion when ordering him to reimburse $25,000 out of Wife's incurred attorney fees in the amount of $150,000.

Indiana Code section 31-15-10-1 provides that a trial court may order a party to pay a reasonable amount to the other party for the cost of maintaining or defending any action in dissolution proceedings. We review a trial court's award of attorney fees in connection with a dissolution decree for an abuse of discretion. *Hartley v. Hartley*, 862 N.E.2d 274, 286 (Ind. Ct. App. 2007). When making such an award, the trial court must consider the resources of the parties, their economic condition, the ability of the parties to engage in gainful employment and to earn adequate income, and other factors that bear on the reasonableness of the award. *Id*. Consideration of these factors promotes the legislative purpose behind the award of attorney fees, which is to insure that a party in a dissolution proceeding, who would not otherwise be able to afford an attorney, is able to retain representation. *Id*. The trial court need not, however, give reasons for its determination. *Hartley*, 862 N.E.2d at 287.

Where, as here, "one party is in a superior position to pay fees over the other party, an award of attorney fees is proper." *Ratliff v. Ratliff*, 804 N.E.2d 237, 249 (Ind. Ct. App. 2004). Despite Husband's contention, other evidence found credible by the trial court suggests that the business generated $420,000 in 2014, and $480,000 in 2015. Viewed in light of the particularized circumstances of this case, we conclude that the disparity of the parties' earnings, Husband's dissipation of marital assets, and his "misconduct that directly result[ed] in

additional litigation expenses" justified the trial court's decision to award attorney's fees to Wife. *Hanson v. Spolnik*, 685 N.E.2d 71, 80 (Ind. Ct. App. 1997), *trans. denied*.

## CONCLUSION

[48] Based on the foregoing, we hold that the trial court did not abuse its discretion in (1) dividing the marital estate between the parties; (2) awarding custody of K.G. to Wife and calculating Husband's child support obligation; and (3) granting attorney fees to Wife.

[49] Affirmed.

Mathias, J. and Brown, J. concur