

# IN THE
# Court of Appeals of Indiana

James Irwin Richter,

*Appellant*

v.

Neha Bhatnagar Richter,

*Appellee*



FILED

Feb 18 2026, 8:37 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

February 18, 2026

Court of Appeals Case No.
25A-DC-1593

Appeal from the Hamilton Superior Court

The Honorable Stephenie K. Gookins, Special Judge

Trial Court Cause No.
29D06-2409-DC-10053

**Opinion by Judge Brown**
Judges Felix and Scheele concur.

**Brown, Judge.**

[1] James Irwin Richter ("Father") appeals the trial court's order related to legal custody of his child, Ni.R. ("Child"), his child support obligation, and Child's passport. We affirm.

**Facts and Procedural History**

[2] Father and Neha Bhatnagar Richter ("Mother") were married, and Child was born in 2011. On October 2, 2012, the court entered an order dissolving the marriage.[1] The court awarded Mother sole legal and primary physical custody of Child subject to Father's parenting time. In October 2012, the court granted Mother's request to relocate to Ohio with Child while Father remained in Indiana.

[3] On April 27 and May 10, 2023, the court held hearings on the issues of custody modification and appointment of a parenting coordinator.[2] On June 2, 2023, the court found that it was not in Child's best interests to modify physical custody but that modifying legal custody to joint legal custody was in Child's best interests.[3] In discussing Mother's assertion that Father was in contempt of

---

[1] The record does not contain a copy of this order.

[2] The record does not contain a transcript of these hearings.

[3] The court noted the parties' conflict. Specifically, the court stated: "A review of the court file from October 2012 to February 2016 reveals litigation between the parties over holiday parenting time, passports, child support, Father's access to the child's records, communication between Father and the child, motions for sanctions and attorney's fees, motions to correct errors, objections to non-party discovery requests, objections to binding recommendations of the [parenting coordinator], motions and objections to the termination of the [parenting coordinator], and relocation – among other issues." Appellant's Appendix Volume II at 61.

an agreed entry for failing to sign the appropriate paperwork for her to renew Child's passport, the court found that Father complied with the terms of the agreement when ordered in 2016 and "[n]othing in the Agreed Order references renewing of [Child's] passport or sets forth an ongoing obligation by Father to consent to a renewal." Appellant's Appendix Volume II at 68. The court declined to order Father to cooperate with Mother in renewing Child's passport and ordered that, "[s]ince the parties cannot agree on this issue, if a renewal of [Child's] passport is to occur it will be either by agreement of the parties or will occur once [Child] is old enough to obtain a passport as an adult." *Id.*

[4] After multiple filings including a report from a mediator indicating that the parties were unable to agree on pending issues in January 2025, the court held hearings on January 27 and 28, 2025, on various issues including Mother's petition for modification of child support, her motion to modify legal custody, and her motion for renewal of Child's passport. The court heard testimony from Mother, Kristen Laidlaw, a middle school learning specialist at Child's school, Dr. Bart Ferraro, the parenting coordinator, Dr. Jennifer Horn, a clinical child psychologist, and Father.

[5] On June 4, 2025, the court entered a twenty-five page order which awarded Mother sole legal custody. The court found that Child's advancement to high school and the opportunity for him to travel internationally for immersion trips constituted a substantial and continuing change in circumstances and that it was in Child's best interest to receive a passport. With respect to Father's income, the court found that Father is self-employed and owns JNZ Investment

Group, LLC, that Father "issues himself a paycheck from JNZ Investment Group, LLC," and that "this is not inclusive of all of the income Father receives." *Id.* at 126. It found that Father's tax returns show that he had a total taxable gross income of $315,356 in 2023 and of $291,692 in 2022. It found that "Father has requested that the court utilize his W-2 income from his paychecks for purposes of calculating child support" and "expressed that any income in addition to his paycheck income is utilized to create a 'pipeline' of income for future property sales." *Id.* The court stated:

> The court declines to reduce Father's income to that as set forth in his W-2 wages. Father has paid child support for years at a level lower than his current income level. The child support guidelines and law are devoid of any exception which would allow for this court to deviate downwards from Father's actual income earned.

*Id.* at 127. The court determined that, "[f]or child support purposes, the Court finds that Father has an average gross annual average of $303,000 or a weekly gross income in the amount of $5,837.00." *Id.*

## Discussion

I.

[6] Father argues that he and Mother have a history of conflict over many years, that Mother testified that the reason she sought a modification of legal custody was the ongoing conflict, and that nothing significant had changed since the court's June 2, 2023 order granting joint legal custody. He asserts the trial

court's conclusion that joint legal custody is not sustainable is just a restatement of its ongoing frustration with the parties' longstanding conflict.

[7] We review custody modifications for an abuse of discretion with a preference for granting latitude and deference to trial courts in family law matters. *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002). "We set aside judgments only when they are clearly erroneous, and will not substitute our own judgment if any evidence or legitimate inferences support the trial court's judgment." *Id.* The Indiana Supreme Court explained the reason for this deference in *Kirk*:

> While we are not able to say the trial judge could not have found otherwise than he did upon the evidence introduced below, this Court as a court of review has heretofore held by a long line of decisions that we are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence, or that he should have found its preponderance or the inferences therefrom to be different from what he did.

*Id.* (quoting *Brickley v. Brickley*, 247 Ind. 201, 204, 210 N.E.2d 850, 852 (1965)).

[8] When considering a modification from joint legal custody to sole legal custody, we must determine whether there has been a substantial change in one or more of the factors listed in Indiana Code § 31-17-2-15, in addition to considering any substantial change to the factors in Indiana Code § 31-17-2-8, as is typically

necessary for physical custody modifications.[4] *J.W. v. M.W.*, 77 N.E.3d 1274, 1277-1278 (Ind. Ct. App. 2017) (footnote omitted) (citing *Milcherska v. Hoerstman*, 56 N.E.3d 634, 641 (Ind. Ct. App. 2016)).

[9]     Ind. Code § 31-17-2-15 provides:

> In determining whether an award of joint legal custody under section 13[5] of this chapter would be in the best interest of the child, the court shall consider it a matter of primary, but not determinative, importance that the persons awarded joint custody have agreed to an award of joint legal custody. The court shall also consider:
>
>> (1) the fitness and suitability of each of the persons awarded joint custody;

---

[4] Ind. Code § 31-17-2-8 provides in part:

> The court shall consider all relevant factors, including the following:
>> (1) The age and sex of the child.
>> (2) The wishes of the child's parent or parents.
>> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>> (4) The interaction and interrelationship of the child with:
>>> (A) the child's parent or parents;
>>> (B) the child's sibling; and
>>> (C) any other person who may significantly affect the child's best interests.
>> (5) The child's adjustment to the child's:
>>> (A) home;
>>> (B) school; and
>>> (C) community.
>> (6) The mental and physical health of all individuals involved.
>> (7) Evidence of a pattern of domestic or family violence by either parent.

[5] Ind. Code § 31-17-2-13 provides that "[t]he court may award legal custody of a child jointly if the court finds that an award of joint legal custody would be in the best interest of the child." "'Joint legal custody', for purposes of . . . IC 31-17-2-13 . . . and IC 31-17-2-15, means that the persons awarded joint custody will share authority and responsibility for the major decisions concerning the child's upbringing, including the child's education, health care, and religious training." Ind. Code § 31-9-2-67.

(2) whether the persons awarded joint custody are willing and able to communicate and cooperate in advancing the child's welfare;

(3) the wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;

(4) whether the child has established a close and beneficial relationship with both of the persons awarded joint custody;

(5) whether the persons awarded joint custody:

(A) live in close proximity to each other; and

(B) plan to continue to do so; and

(6) the nature of the physical and emotional environment in the home of each of the persons awarded joint custody.

[10] The factor under subsection (2) of Ind. Code § 31-17-2-15 is of particular importance in making legal custody determinations. *Milcherska*, 56 N.E.3d at 641 (citations omitted). "Where 'the parties have made child-rearing a battleground, then joint custody is not appropriate.'" *Id.* at 642 (quoting *Periquet-Febres v. Febres*, 659 N.E.2d 602, 605 (Ind. Ct. App. 1995), *trans. denied*). "Indeed, to award joint legal custody to individually capable parents who cannot work together is tantamount to the proverbial folly of cutting the baby in half in order to effect a fair distribution of the child to competing parents." *Id.* (quoting *Swadner v. Swadner*, 897 N.E.2d 966, 974 (Ind. Ct. App. 2008)).

[11] In its order, the trial court found that, since the June 2, 2023 order awarding joint legal custody, Father demonstrated unilateral decision making by

attempting to have Child psychologically evaluated by a therapist, enrolling Child in a dyslexia camp, refusing to provide the camp with Mother's contact information, and enrolling Child in a Christian youth retreat. It observed that the parties commenced work with Dr. Ferraro but "there was little progress in the parties co-parenting relationship or on legal custody decision making." Appellant's Appendix Volume II at 138. It stated:

112. The Court has set forth the laborious efforts of Dr. Ferraro, Ms. Laidlaw, and Dr. Horn to demonstrate that the ability to get along and work in [Child's] best interest with the parents exercising joint legal custody is not working at all. Joint legal custody has done NOTHING to ease the distrust or improve the communication between these parents who continue to be more concerned with their own desire to be RIGHT and have things THEIR WAY rather than doing what is best for [Child]. The Court finds the litigious behavior of these parties over the last fourteen years to be exhausting, self-serving and far from the best interest of [Child]. The Court implores these parties to step back and reflect on their actions to determine if what they wish for their son to remember about his childhood is fighting parents who can never just get along.

\* \* \* \* \*

114. The court finds that the parties sharing joint legal custody is not sustainable financially or otherwise. The parties are unable to effectively co-parent and make decisions jointly for [Child] about anything.

115. The court finds that a substantial and continuing change in circumstances has occurred which no longer makes joint legal custody in [Child's] best interest. As [Child] is primarily in the care of Mother and Mother had sole legal custody from 2012 through 2021, the court finds Mother is best suited to be awarded sole legal custody.

116. Mother is warned not to view the award of sole legal custody as a victory that allows her to return to her ways prior to the June 2023 order. Mother shall communicate with Father about all decisions. Prior to making any legal custody decision, Mother shall consult with Father relating to same. Discussion shall occur between the parties with both parties providing input relating to same via OFW. In the event of an impasse, Mother shall have the final say relating to said decision.

*Id.* at 140-141.

[12] The record reveals that Mother testified that Father had taken unilateral actions without informing her including making an appointment for Child to see a doctor regarding mental health concerns. When asked if she and Father had difficulties working through legal custody decisions since joint legal custody was awarded, Mother answered affirmatively. She testified that Father met with Dr. Horn individually without her being involved, which caused conflict because Dr. Ferraro told her and Father that they were "not to communicate without each other being involved." Transcript Volume II at 72. When asked, "[a]t this point is having joint legal custody become a battleground," Mother answered affirmatively. *Id.* at 107. On cross-examination, Mother indicated that she was asking for a change in legal custody due to the conflict between her and Father. When asked if she agreed that the conflict between her and Father existed at the time of the June 2, 2023 order, Mother answered, "No – it was a different level of conflict." *Id.* at 216. Dr. Ferraro, the parenting coordinator who was appointed in September 2023, testified that Mother and Father "do not coparent without significant difficulty." *Id.* at 162. He also indicated that

Father took actions to retain a therapist for Child without Mother's knowledge. When asked if it was best for Child to "keep these parties in conflict," he answered, "No." *Id.* at 169. In light of the record, we cannot say reversal is warranted.

II.

[13] Father argues the trial court erred in calculating his child support obligation "by misstating the law applicable to self-employment income." Appellant's Brief at 13. He asserts the court calculated his income "based on its belief that deducting ordinary and necessary business expenses was a 'downward deviation' that it had no authority to grant." *Id*. at 15. He requests that we reverse the child support order and remand for recalculation of his income in a manner consistent with Ind. Child Support Guideline 3A(2). Mother argues that the admitted tax returns show that Father had income in excess of the salary he paid himself from his companies and that Father supplied no numerical information related to expenses.

[14] On review, a trial court's calculation of child support is presumptively valid. *Bogner v. Bogner*, 29 N.E.3d 733, 738 (Ind. 2015). When a trial court takes the time to announce her findings and conclusions thereon, the court on appeal shall not set aside the findings or judgment unless clearly erroneous. *Id.* We do not reweigh the evidence and consider only the evidence most favorable to the judgment. *Saalfrank v. Saalfrank*, 899 N.E.2d 671, 674 (Ind. Ct. App. 2008).

[15] Ind. Child Support Guideline 3A(1) provides that "weekly gross income" is defined as actual weekly gross income of the parent if employed to full capacity, potential income if unemployed or under-employed, and the value of "in kind" benefits received by the parent. Weekly gross income includes but is not limited to income from salaries, commissions, bonuses, partnership distributions, dividends, interest, and capital gains. Ind. Child Support Guideline 3A(1).

[16] Ind. Child Support Guideline 3A(2) provides "Weekly Gross Income from self-employment, operation of a business, rent, and royalties is defined as gross receipts minus ordinary and necessary expenses," "[i]n general, these types of income and expenses from self-employment or operation of a business should be carefully reviewed to restrict the deductions to reasonable out of pocket expenditures necessary to produce income," "[t]hese expenditures may include a reasonable yearly deduction for necessary capital expenditures," and "Weekly Gross Income from self-employment may differ from a determination of business income for tax purposes." It further provides, "[e]xpense reimbursements or in-kind payments received by a parent in the course of employment, self-employment, or operation of a business should be counted as income if they are significant and reduce personal living expenses" and "[s]uch payments might include a company car, free housing, or reimbursed meals."

[17] The Commentary to Guideline 3A states, "[i]n calculating Weekly Gross Income, it is helpful to begin with total income from all sources" and "[t]his figure may not be the same as gross income for tax purposes." It further states that "[c]alculating Weekly Gross Income for the self-employed or for those who

receive rent and royalty income presents unique problems, and calls for careful review of expenses," "[t]he principle involved is that actual expenses are deducted, and benefits that reduce living expenses (i.e. company cars, free lodging, reimbursed meals, etc.) should be included in whole or in part," "[i]t is intended that actual out of pocket expenditures for the self-employed, to the extent that they are reasonable and necessary for the production of income, be deducted," and "the deductions allowed by the Guidelines may differ significantly from those allowed for tax purposes." It also states that income from commissions and periodic partnership distributions are includable in the total income approach taken by the Guidelines and is "also very fact sensitive."

[18] Here, Father testified that he was a commercial real estate broker and investor and that he paid himself a salary from JNZ Real Estate Group, LLC, and JNZ Investment Group, LLC. He indicated that his "combined total ends up hitting about 130,000 a year." Transcript Volume III at 152. He indicated that his tax returns included income from both JNZ entities because they were pass-through entities. He acknowledged that his tax returns showed that he made more than $120,000 or $130,000. When asked "why don't you just pay yourself all of that money," he replied "[i]t goes back to my primary issue throughout my career," "there have been large gaps in between paychecks," and "so I've wanted to make sure that my operating budget and payroll can always be met." *Id.* at 153. He indicated his income is not dependable. He testified regarding having real estate deals in the pipeline and how his current deals in the pipeline compared to those which generated the approximately $300,000 in annual income. On

cross-examination, Father indicated that at times his "investment group pays [his] attorney fees." *Id*. at 173. When asked, "[s]o [] somebody is paying your attorney fees on your behalf and that would be the investment group that you don't want included for purposes of income in your child support calculation; is that also fair to say," Father replied "No," and when asked "[w]hy is that not fair to say," he testified "[b]ecause no one else owns the company besides me." *Id*. at 173-174. When asked, "since you're the only person who owns the company and you're the only person that has access to those funds and the only person that is earning income, isn't it fair that the Court assesses all of the income that you make in various years to you alone," Father answered "No," and when asked "[w]hy not," he replied "Because I have company expenses. The operation of the business." *Id*. at 174.

[19] The court admitted tax return documents for Father and JNZ Investments, LLC. The tax return history report attached to Father's 2023 tax return indicates that Father had a total income in 2023 of $315,356 and a total income in 2022 of $291,692.[6] Father does not make an argument or point to the record to show that these amounts or the tax documents on which they are based, failed to include deductions for, or otherwise account for, appropriate expenses reasonable and necessary for the production of income.[7] Trial courts make

---

[6] These total income figures include Father's income from salaries and wages, taxable interest income, dividend income, capital gains/losses, business income, rental income, and partnership/S corporation income.

[7] The admitted documents show deductions for expenses. *See* Exhibits Volume V at 35-36 (comparison report of Father's income and expenses for 2022 and 2023 with respect to his rental income, including

case-by-case determinations regarding weekly gross income from self-employment for the purpose of computing child support based on specific circumstances as they exist or are presented to the court. *See Goodman v. Goodman*, 94 N.E.3d 733, 750 (Ind. Ct. App. 2018), *reh'g denied*, *trans. denied*. Based on the circumstances presented to the court, and in light of the admitted evidence and testimony regarding his income, we cannot say that the trial court erred in determining Father's weekly gross income for the purpose of calculating his child support obligation.

III.

[20] Father argues that the trial court abused its discretion with respect to its order that Child receive a passport because the alleged change was foreseeable and did not make the prior order unreasonable. He argues that Child's "matriculation from middle school to high school within the same institution is a foreseeable developmental milestone." Appellant's Brief at 19. He asserts that the court's June 2, 2023 order is not made impossible or even unreasonable by Child's advancement to high school.

---

expenses for mortgage interest, taxes, and depreciation, and Schedule C business profit, which included expenses for travel, meals, and office expenses); *id*. at 62, 93 (showing JNZ Investment Group, LLC's gross receipts of $321,850 and total deductions of $249,798 for 2023, including deductions for compensation of officers, rents, repairs and maintenance, pension or profit sharing plan, office supplies, telephone, travel, vehicle expenses, and meals); and *id*. at 124 (comparison report of JNZ Investment Group, LLC's net receipts and deductions for 2022 and 2023).

In its June 4, 2025 order, the trial court found the following with respect to Mother's request for a passport for Child:

> 67. Mother has requested that the parties obtain a passport to allow for [Child] to participate in school enrichment or immersion trips. Father objects to that request and has expressed that this issue has been resolved by the court and shall not be relitigated. Mother believes the issue of obtaining a passport is a child related issue which may be modified based upon a substantial change in circumstances.
>
> 68. This court agrees with Mother.
>
> 69. [Child] is matriculating to high school. Mother expressed that as part of his curriculum with Miami Valley School, [Child] may attend international immersion trips which would benefit his education and would require [Child] to have a passport for same.
>
> 70. Father has expressed concerns that Mother exhibits a pattern of alienation which concerns him that with a passport, Mother be [sic] able to abscond to India or some other foreign country with [Child].
>
> 71. Mother is a U.S. citizen who has an established life in Ohio, with her current husband, her subsequent born child and [Child]. Mother is gainfully employed through her parents' company and earns sufficient income to support her family. Mother's immediate family resides in the United States [along with] most of her extended family, with the exception of a few distant relatives who remain in India.
>
> [Child] has previously had a passport; however, that passport expired when Father refused to renew it and since said time the court has ordered that same not be renewed until such time as [Child] can obtain a passport as an adult.
>
> 72. Working with Dr. Ferraro, the parties reached an agreement to obtain a passport for [Child]; however, there was conflict over

who would hold same when neither party was traveling with [Child] or [Child] was not traveling. Father desired his counsel maintain the passport; however, due to lack of trust and belief same would be withheld, Mother objected to same.

73. The court finds that due to [Child's] advancement to high school and the opportunity for him to travel internationally for immersion trips, that a substantial and continuing change in circumstances has occurred and that it is in [Child's] best interest to receive a passport.

* * * * *

75. The court finds that any intended misuse of the passport by either party can be controlled through the use of the parenting coordinator holding [Child's] passport in trust pending agreement of the parties, or order of the court which would allow [Child] to travel utilizing same.

76. The court gives the parenting coordinator authority to make decisions by way of binding recommendations relating to [Child's] travel and use of this passport for travel with either parent.

77. The passport shall be provided to the parent who will have [Child] in their custody when said travel occurs at least twenty (20) days prior to travel. Each parent may keep a copy of said passport in their possession. Mother shall pay the costs associated with and shall be responsible for obtaining said passport for [Child]. Father shall, upon request from Mother, execute any forms and provide any documentation needed to obtain same. Mother shall ensure that within ten (10) days of receiving same, she provides the physical passport to the parenting coordinator or her counsel who shall make it available to the parenting coordinator.

Appellant's Appendix Volume II at 129-130.[8]

[22] The record reveals that Mother indicated that Child has the opportunity "to do immersions that go abroad." Transcript Volume II at 33. Mother testified that Child's passport had expired, that she does not want to live in India, and that she agreed not to travel to India with Child. She also indicated that she would be agreeable to the court issuing an order allowing Child's passport to be issued for the sole purpose of traveling on school immersion trips. With respect to the passport, Dr. Ferraro stated:

> [M]y understanding was that what was different this time and what stood out to me was the potential that the passport could be obtained and utilized by [Child] for school or community related international travel in which neither parent would be permitted formally or informally to attend. Those parameters seemed to me to put the issue back into play in a way that for me was more child focused and impacted the fear associated with potential abduction.

*Id.* at 186-187. In light of the record and the court's order, we cannot say reversal is warranted with respect to Child's passport.

[23] For the foregoing reasons, we affirm the trial court.

[24] Affirmed.

---

[8] In its discussion of legal custody, the trial court stated: "Dr. Ferraro expressed that from his perspective, there was value in [Child] having a passport, even if that was limited to his ability to attend immersion trips." Appellant's Appendix Volume II at 139.

Felix, J., and Scheele, J., concur.

ATTORNEYS FOR APPELLANT

Bryan L. Ciyou
Ciyou & Associates, P.C.
Indianapolis, Indiana

Anne M. Lowe
Fugate Gangstad Lowe, LLC
Carmel, Indiana


ATTORNEY FOR APPELLEE

Dyllan M. Kemp
Eimerman Law
Noblesville, Indiana